Thomas E. BARTELS, Kathleen M. Bartels, Judith A. Bartels and Georgine L. Bartels, minors, by their mother and next friend, Kathleen P. Bartels, and Kathleen P. Bartels, Widow of George E. Bartels, Respondents,

v.

CONTINENTAL OIL COMPANY, a corporation, Appellant.

No. 50254.

Supreme Court of Missouri,

Division No. 2.

Nov. 9, 1964.

Motion for Rehearing or for Transfer to Court En Banc Denied Dec. 14, 1964.

William W. Shinn, Kansas City, for respondents, Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, of counsel.

J. D. James, Thad C. McCanse, Dwight L. Larison, Houts, James, McCanse & Larison, Kansas City, for appellant.

BARRETT, Commissioner.

George E. Bartels died as a result of injuries sustained while engaged in the performance of his duties as a captain in the Kansas City, Missouri, fire department. In this action to recover damages for his negligent injury and death his widow and four minor children have recovered a judgment of $25,000. The defendant-appellant, Continental Oil Company, operated a bulk storage plant and filling station on the northwest side of Southwest Boulevard at 31st Street in Kansas City, Kansas, abutting the Missouri-Kansas state line. On the front of the lot, facing Southwest Boulevard, there was a filling station and to the rear of the station on concrete saddles there were four 21,000 gallon capacity storage tanks. Tank number one contained 6,628 gallons of kerosene, tank number two contained 14,307 gallons of regular gasoline, tank number three contained 3,051 gallons of regular gasoline and tank number four contained 15,555 gallons of premium gasoline.

On August 18, 1959, about eight o'clock in the morning, Fred Berry, one of the appellant's tank-truck drivers was engaged in loading his truck from storage tanks two and four. Hoses from these two tanks were open at the same time, filling truck compartments three and five. Berry was on the truck's catwalk when Jim Mitchum, another tank-wagon driver on vacation, climbed up the side of the truck to show Berry his new cigarette lighter. Almost immediately (possibly when Mitchum flicked his lighter) flames flashed from the tank-truck's fifth compartment. Berry cut off the hose from one of the storage tanks but ran from the blazing flames and did not cut off the hose from the other storage tank and throughout the ensuing fire that open hose continued pouring gasoline into the flames. Firemen from both Kansas City, Missouri, and Kansas City, Kansas, responded to the alarm and with hand lines, almost wholly from Southwest Boulevard, fought the fire with water. The streams of water were employed to confine the

burning gasoline to the area of the storage tanks thereby preventing the gasoline from running down Southwest Boulevard and into the sewers of Kansas City, Missouri, endangering larger areas. About 9:15 storage tank number one ruptured at its rear and the area was engulfed in flaming kerosene intensifying the heat in the area of the other three tanks. In the next half hour tanks two and three ruptured, and about 9:40 tank number four left its concrete cradle and "rocketed" or was catapulted 75 to 100 feet over the filling station into Southwest Boulevard and "a ball of fire" engulfed the several crews of fire fighters in the street, killing one bystander and five firemen, including Captain Bartels, and injuring twenty-three people.

Since, as a general rule, "the duty of a possessor of land to firemen is the same as to licensees" (Anderson v. Cinnamon, 365 Mo. 304, 282 S.W.2d 445, 447, 55 A. L.R.2d 516), it is urged that upon this record there is no evidence of a violation of duty by Continental. It is said that the appellant's duty was not enlarged by the fact that Bartels was in the street when injured, that "(t)here was no unusual, hidden hazard that was unknown to the deceased and known to the defendant" and therefore there was no duty to warn that the tanks might rupture. In this connection it is urged that there was "no duty to warn deceased that the storage tank in question might rocket onto the street because (1) that fact was not known by the defendant (Continental); and (2) even had such a duty existed, there was no evidence that defendant had an opportunity to give such a warning." Further precisely pointing up the appellant's contention that its motions for a directed verdict should have been sustained is its claim that the respondents' instruction one was "reversibly erroneous" in several respects, but particularly in that it "was not supported by the evidence."

It is not necessary to a disposition of this appeal to enter upon an extended discussion of the general rules or to determine Bartels' status. The general rules are set forth and the applicable cases collected in Anderson v. Cinnamon, supra, and its annotation, 55 A.L.R.2d 525, "Duty of a possessor of land to warn adult licensees of danger," and see more recently 86 A.L.R.2d 1205, "Duty and liability of owner or occupant of premises to fireman or policeman coming thereon in discharge of his duty." And upon the merits of the cause there are no precisely applicable and governing Kansas cases. Nevertheless it is safe to say that Kansas applies the general rules both as to the status of firemen and the duties of landowners, particularly in the maintenance of gasoline storage facilities. Buchholz v. Standard Oil Co. (1922) 211 Mo.App. 397, 244 S.W. 973; Pinson v. Young, 100 Kan. 452, 164 P. 1102, L.R.A. 1917F, 621. In the Buchholz case gasoline storage tanks at Hays, Kansas, (an installation comparable to that of Continental's here) burned and exploded and when the larger tank exploded "one end of it was shot southward across the railroad tracks and against a flourmill which was about 200 feet away, the other end, like a torpedo, went toward the north, * * * and landed in the rear of a house which stood about 500 feet distant."

 Under these general rules, admittedly, an experienced fire captain would of course accept the presence of kerosene and gasoline as a known hazard of a fire in a gasoline storage facility. Anderson v. Cinnamon, supra; Gannon v. Royal Properties, 285 App.Div. 131, 136 N.Y.S.2d 129; Wax v. Co-Operative Refinery Ass'n, 154 Neb. 805, 49 N.W.2d 707. But the law does not compel firemen in fighting a fire to assume all possible lurking hazards and risks (Gannon v. Laclede Gas Light Co., 145 Mo. 502, 46 S.W. 968, 43 L.R.A. 505); it may not be said that a "fireman has no protective rights whatever." Campbell v. Pure Oil Co., 15 N.J.Misc. 723, 194 A. 873, 875; Wainscott v. Carlson Const. Co., 179 Kan. 410, 295 P.2d 649. As indicated, the majority of cases, including Anderson v. Cinnamon and other cases relied on by the

appellant, recognizes certain modifications or exceptions to the general rules relating to landowners and firemen and it is these principles upon which the respondents rely, —"that an owner or occupant of premises which firemen enter upon in the discharge of their duty may be held liable to a fireman injured by a hidden danger on the premises, where the owner or occupant knew of the danger and had an opportunity to warn the fireman of it." 86 A.L.R.2d 1. c. 1214, 55 A.L.R.2d 1. c. 526. And the essentially meritorious question upon this appeal is whether there was upon this record evidence to support the inference and finding of a hidden danger known to the appellant Continental Oil Company for "(c)ertainly, no meritorious reason can be advanced to justify the view that a property owner, with knowledge of a hidden peril, should be allowed to stand by in silence when a word of warning might save firemen from needless peril. * * * Although firemen assume the usual risks incident to their entry upon premises made dangerous by the destructive effect of fire, there is no valid reason why they should be required to assume the extraordinary risk of hidden perils of which they might easily be warned.'" Shypulski v. Waldorf Paper Products Co., 232 Minn. 394, 401, 45 N.W. 2d 549, 553; Jenkins v. 313–321 W. 37th St. Corp., 284 N.Y. 397, 31 N.E.2d 503.

Continental's four storage tanks, constructed of quarter-inch steel, were installed in 1924. They were 30 feet long, eleven feet in diameter, with flat ends, and when installed as well as 35 years later "were fitted with two-inch pressure valves." Originally the tanks were installed perpendicularly but in 1958 Continental Oil Company dismantled the storage facilities, removed the two-inch vents, and installed the four tanks horizontally on the concrete saddles. But in changing or replacing the installation Continental again placed two-inch vents on the tops of the storage tanks. And in response to interrogatories and "requests for admissions" Continental stated that the "four tanks was (sic) vented only by a single A. Y. McDonald 2-inch Plate 925 combination gauge hatch and P & R valve, known as a 'breather valve.' * * * that these said four tanks had no vent or mechanism designed to relieve pressure (such as might occur during a fire) other than whatever relief was provided by the single 2-inch diameter breather valve on each tank." The appellant has made unnecessary further recitation of the facts in connection with these valves because in its brief there are these further concessions; "(t)he four tanks in question were vented with 2" pressure and relief valves, which were admittedly (and obviously) not adequate to keep these tanks from rupturing;" and, "we will concede for the purpose of that question only (viewing the record favorably to the respondents), without admitting it, that by reason of the size of the vents, defendant did not maintain the premises in a reasonably safe condition, and that that was the cause of the ruptures."

In addition to these admissions the Chief of the Fire Prevention Division of the Kansas City, Missouri, Fire Department, who was present while the fire was in progress and when tank number four rocketed, and afterwards made an investigation, testified that the reason the tanks ruptured was that "(t)he vents were too small." He testified that the Flammable Liquids Code required "5-1/2 inches of emergency venting." An expert witness, "a protection engineer specializing in petroleum hazards," referred to all the literature connected with the petroleum industry (with which Continental was familiar) and in connection with his years of experience in the industry, testified that for petroleum storage tanks of 18,000 to 25,000 gallon capacity "a free circular opening of 5-1/2 inches in diameter" was required. As he testified on both direct and cross-examination this witness gave the formulas and made the computations as to the "normal safety operating pressures of a tank" as well as the pressures built up in a storage tank during a fire. He testified that tank number four rocketed because the two-inch vent was not large enough to take care

of the vapor generated by the fire. And, he said, "I can say without any worry at all that no tank that has been equipped with the vent of the size specified in these suggested standards (5-1/2 inches) has ever rocketed." The appellant's expert, a professor of chemical engineering at Kansas University, was of the opinion that a 5-1/2 inch valve would not have prevented the rocketing; but even this witness was of the opinion that a 7-1/2 inch vent "would have been sufficient to vent all the vapor which was formed" in this fire and would have prevented the rocketing of tank number four.

And upon this particular phase of the case, in its answers to interrogatories and in counsel's opening statement, there were these additional admissions: "that Continental Oil Company and Continental Oil Company officials, the officials of my client, knew at the time of this casualty that a two-inch vent was small enough that there was more apt to be a rupture in the event of an exposure fire * * *. And I want to tell you here at the outset that there is no real issue about that, there is no issue whatever. These were old-fashioned tanks. The two-inch vents in these tanks were smaller than was recommended by the literature, by the National Fire Protection Association and the Association of Petroleum Industries * * *." And further of knowledge by the industry, he said, "Our company people * * * read the literature, * * * their safety director belonged to some of these organizations, and was on committees, and so they did know full well long before 1959 that a larger emergency vent would be safer."

While Bartels was an experienced fireman and was therefore necessarily aware of some of the hazards of petroleum products fires, there is no fact or circumstance indicative of any knowledge on his part that these particular storage tanks were equipped with inadequate safety vents. And as the appellant says in its brief "(a)lthough the men on the line knew the No. 4 tank would probably rupture (since the three other tanks had ruptured), they did not know the tank would rocket in the freakish manner in which it did. They had never seen a tank act like that. The action of this particular tank was entirely unpredictable." Also aerial photographs taken while the fire was in progress and before tank number four rocketed, as well as the testimony of witnesses, reveal that it was not possible through the enormous black smoke clouds and flames that firemen or anyone else could or did see the two-inch valves on the tanks, much less appreciate their danger. The fire prevention chief and other firemen testified that they did not know the size of the safety valves on the tanks. Six of Continental's employees, including its bulk plant supervisor, were present prior to and during the course of the fire and of course there were no warnings in any manner to the firemen that the tanks were equipped with the inadequate two-inch vents. Compare Wax v. Co-Operative Refinery Assn., supra, in which there was a warning before the last tank exploded. And, it may be added, there were no dikes (Campbell v. Pure Oil Co., supra), warning signs or other safety devices. Some of the firemen heard a "hissing sound" before tank number four rocketed but others heard no such sound.

Further and explicit details could be recited and permissible inferences indicated, it is sufficient, however, to say that in these particularly detailed circumstances the evidence favorable to the plaintiffs supports the finding of a known hidden danger of which there was no warning whatever, a hazard that in any and all events Bartels as a fireman was not bound to accept as a usual peril of his profession. In these circumstances reasonable minds could differ and Continental was not for any of the reasons advanced here entitled to a directed verdict. Aside from Buchholz v. Standard Oil Company, supra, which treated the hazard as "a nuisance," the case nearest in point on its facts is Lamb v. Sebach, 52 Ohio App. 362, 3 N.E.2d 686, in which in 1935 a fireman was injured when a 10,000 gallon capacity storage tank exploded. In

that case a two-inch valve had been reduced to "three-eighths of an inch, and \* \* \* such reduction reduced the effectiveness of these vents as a safety device 97 per cent, and made the tanks dangerous." There plaintiff's reliance was upon a "hidden and concealed danger concerning which he was given no notice or warning." The Ohio court concluded that "(u)nder this state of the proof it surely was a question of fact for the jury to determine whether it was or was not the affirmative act of the defendants in restricting the size of the vent on Tank No. 2 that caused the plaintiff's injury, and which was the proximate cause thereof." Or as the Kansas court said when dynamite exploded and injured a fireman, "It is next contended that the fire, and not negligent storage of the dynamite, was the proximate cause of Pinson's wrongful death. Both were proximate causes. The fire alone would not have caused his death. The dynamite alone might not have caused it. Perhaps the fire was the result of negligence. The storage of the dynamite was undoubtedly so. These two contributing delinquencies, the fire and the negligent storage of the dynamite, both proximate, wrought this result." Pinson v. Young, 100 Kan. 452, 455, 164 P. 1102, 1104.

█ In considering the merits of the cause appellant's objections to instruction one have for the most part been disposed of, certainly so the objections as to its duty, that the instruction was not supported by the evidence and the claim that it contained a positive misdirection of law. The instruction is too long to quote and analyze fully, although it was not confusing and misleading as was the single sentence eight hundred word instruction in Johnson v. Missouri-Kansas-Texas R. Co., Mo., 355 S.W.2d 32, 35. There is no claim that the instruction is lacking in factual detail and its essence is that it hypothesized a finding of a 21,000 gallon capacity tank "vented only with a 2-inch vent," that it had been maintained for a number of years, that Continental "knew or should have known that in the event of a sustained exposure

fire in the vicinity of such tanks a 2-inch vent would not adequately vent such tanks and that a rupture would likely occur, \* \* \* and that defendant Continental Oil Company failed to provide or install any device reasonably designed to prevent tank No. 4 from rupturing and rocketing as it did on August 18, 1959." The instruction hypothesized Bartels' attendance upon the fire, in brief, the details of the fire, the pressure in the tank, the rocketing and finally a finding that Continental *"could have reasonably expected firemen not to realize the particular risk involved* that such tank might rocket, and that *Continental failed to warn George Bartels* or his superiors *of such risk,* and that on the morning in question *George Bartels was exercising ordinary care for his own safety under the circumstances* \* \* \*."

It may be that the italicized language is the equivalent of a specific submission that Bartels "was unaware of the danger involved." Wattels v. Marre, Mo., 303 S.W.2d 9, 66 A.L.R.2d 433. But if it is not an equivalent hypothesis, it is not necessary to collect and distinguish the cases on this subject, it is sufficient to say that in the business invitee cases the purpose of the "no knowledge" doctrine in instructions is to explain the owner's "nonliability on a showing of 'obviousness' " of the danger (Swanson v. Godwin, Mo., 327 S.W.2d 903, 912) or of actual knowledge of the hazard by the invitee. Gregorc v. Londoff Cocktail Lounge, Mo., 314 S.W.2d 704, 708. It may well be in the business invitee cases where the plaintiff falls, due to objects on floors or stairways, that it is an essential element of the plaintiff's case "to prove and submit the proposition that she had no knowledge of the existence of the danger and that defendants breached their duty by not warning her of it." Schwartz v. S. S. Kresge Co., 238 Mo.App. 1165, 1172, 185 S.W.2d 37, 40; Milliken v. Trianon Hotel Company, Mo.App., 364 S.W.2d 71, 74; Daggs v. Patsos, Mo.App., 260 S.W.2d 794, 798–799; Stafford v. Fred Wolferman, Inc., Mo., 307 S.W.2d 468. But if the italicized language

is not a sufficient hypothesis the fact that the plaintiffs made a submissible case upon the theory that *the hazard was hidden* (the only theory upon which they could recover) of necessity implies no knowledge of the danger on the part of the fireman. A finding that Bartels "was exercising ordinary care for his own safety under the circumstances" was required. And finally, in view of the essential, disputable issues and the circumstances of this record, it would appear unreasonable to say that instruction one was prejudicially erroneous in not more explicitly requiring a finding that Bartels had no knowledge of the two-inch vents, their inadequacy and their danger. Coplen v. Zimmerman, Mo., 271 S.W.2d 513, 517;

Edwards v. E. B. Murray & Company, Mo. App., 305 S.W.2d 702, 706–707 (an opinion by Judge Cave who also wrote the Schwartz case); Swanson v. Godwin, supra.

Therefore, in view of these indicated reasons, the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.