# Richmond

CHESAPEAKE AND OHIO RAILWAY COMPANY V.
JEWEL RAMSEY CROUCH, ADMINISTRATRIX, ETC.

March 4, 1968.

Record No. 6541.

Present, All the Justices.

*Henry M. Sackett, Jr. (Williams, Robertson & Sackett,* on brief),
for plaintiff in error.

*Paul Whitehead; William L. Wilson* for defendant in error.

CARRICO, J., delivered the opinion of the court.

Jewel Ramsey Crouch, administratrix of the estate of Malcolm Lee
Crouch, deceased, filed a motion for judgment against Chesapeake
and Ohio Railway Company, the defendant, seeking to recover
damages for the allegedly wrongful death of Malcolm Lee Crouch.
The motion for judgment alleged that the defendant had negligently
caused to be started on its right-of-way a fire which spread to ad-
joining property and that when the deceased, "in response to request
from Forest Warden," attempted to extinguish the fire, he was
severely burned, resulting in his death.

The defendant filed grounds of defense denying negligence on its part and asserting contributory negligence and assumption of risk on the part of the deceased.

A jury trial resulted in a verdict in favor of the plaintiff in the sum of $35,000.00. The verdict was approved by the trial court in its final order, and the defendant was granted a writ of error.

The tragic accident which was the source of this litigation occurred on April 18, 1964. In the early afternoon of that day, sparks from one of the defendant's trains started a fire in the dry grass and weeds on the right-of-way near Joshua Falls on the James River in Amherst County. The fire soon spread to woodland on the adjoining land of E. R. Steger and report thereof was made to the local fire warden, Esmond Brightwell.

Brightwell, before going to the fire himself, sent his nephew to the nearby residence of the deceased to "call" the latter to "come and help" control the fire. The deceased was not at home at the time; but when he returned, his wife told him that Brightwell wanted him to help fight the fire.

The deceased, who was a member of the local volunteer fire department and experienced in fighting forest fires, went to the scene of the fire. He spoke to Brightwell, who was engaged with several other men in raking a line to prevent the spread of the fire. He then went farther into the woods where he joined John McFaden, a fire warden, and Lloyd Evans, who had been "requested" by McFaden to help put out the fire.

McFaden, Evans, and the deceased were raking in a draw or hollow at the foot of a mountain when "wind got in" the fire and it "just blew up" on them and became "extremely hot."

The deceased suggested that he and his companions lie down in "a bare spot a few feet" away and "let the fire go over top" of them. McFaden, however, said, "No . . . let's get out of here."

The three men started to "run . . . out of there." Brightwell, meanwhile, in fighting the fire, had proceeded up the same draw or hollow where McFaden, Evans, and the deceased had been working. Brightwell saw the deceased come out of the woods "hollering for help and running." When Brightwell went to the deceased, he saw that he was badly burned.

McFaden and Evans escaped the fire by going up the side of the mountain, over a ridge, and down the opposite side. When they had reached safety and were resting from their ordeal, they heard Brightwell "holler"; and when they "went down to where he was at,"

they saw the deceased "sitting on the bank" of a creek in a severely burned condition. The deceased told McFaden that "he fell."

The deceased was taken to a hospital in Lynchburg and later was transferred to a hospital in Richmond where he died on June 4, 1964.

The case was tried in the court below upon common law principles. The jury was instructed, without objection, that for the plaintiff to recover, she was required to establish that the fire resulted from the defendant's negligence and that such negligence was the proximate cause of the death of the deceased. We do not consider, therefore, the possible application to the situation before us of Code, § 56-428, relating to the liability upon railroad companies for damages caused by fires started by engines or trains of such companies.

The assignments of error raise numerous issues; and in its brief, the defendant argues fully the four principal questions which it asserts are presented by this appeal, namely: whether it was negligent *quoad* the deceased; whether its negligence in starting the fire, which it now concedes, was the proximate cause of the death of the deceased; whether the deceased, as a matter of law, was guilty of contributory negligence; and whether the deceased, as a matter of law, assumed the risk of the hazards of the fire.

When we examine the brief of the plaintiff, we find that she argues only the application of the so-called "rescue doctrine," seemingly as a palliative for all the errors the defendant claims to exist in the judgment under review. But when we turn to the record, we find that, although the plaintiff offered an instruction which would have submitted the issue of the rescue doctrine to the jury, the instruction was refused. The plaintiff neither excepted to such refusal nor assigned cross-error thereto. In any event, the holding about to be made renders inappropriate any application of the rescue doctrine.

[1] In our view, the crucial determination to be made is whether the defendant is correct in its contention that the deceased, as a matter of law, assumed the risk of the hazards of the fire in which he received his fatal injuries.

It is difficult to tell what the plaintiff's position is with regard to the issue of assumption of risk; but apparently it is that because the deceased was summoned by a fire warden under the authority of Code, § 10-59, rather than going voluntarily, to fight the fire, it cannot be said, as a matter of law, that the deceased assumed any risk.

Code, § 10-59 provides, in its pertinent parts, as follows:

"Any forest warden to whom written instructions have been issued by the State Forester authorizing him to employ persons to assist in suppressing forest fires, shall have the authority to summon as many able-bodied male persons between eighteen and fifty years of age as may, in his discretion, be reasonably necessary to assist in extinguishing any forest fire which may burn in any county or city of this State which is organized for forest fire control under the direction of the State Forester. Any person so summoned by a forest warden to fight a forest fire shall be paid for such service at such rate of pay as is provided for in the State forest service wage scale for fire fighting in effect in the county or city, or part thereof, in which the fire is fought. . . .

"Any person so summoned who shall fail or refuse to assist in fighting such fire, unless such failure is due to physical inability or other good and valid reason, shall be guilty of a misdemeanor, and upon conviction, shall be fined not more than twenty-five dollars."

Code, § 10-59 must be read in conjunction with Code, § 10-57 which provides, in part, as follows:

"When any forest warden sees or there is reported to him a forest fire, he shall repair immediately to the scene of the fire and employ such persons and means as in his judgment are expedient and necessary to extinguish the fire, within the limits of the expense he has been authorized to incur in his instructions from the State Forester. . . ."

The legislature, therefore, by the enactment of Code, § 10-57, has conferred upon forest wardens the authority to *employ* persons to assist in extinguishing forest fires, obviously contemplating a situation where the necessary assistance can be obtained without resort to compulsion. But where the needed assistance cannot be so freely secured, the legislature, by Code, § 10-59, has conferred upon forest wardens the authority to *summon* persons to help in fighting fires, placing those so summoned under pain of prosecution for their failure or refusal to give aid.

Unfortunate though it may be for the plaintiff's position, the record simply does not support the proposition that the deceased assisted in fighting the fire in question because he was summoned under Code, § 10-59 to do so but, rather, because of a prior voluntary arrangement with the forest warden.

In the first place, the plaintiff's motion for judgment alleged that the deceased attempted to extinguish the fire "in response to request from Forest Warden." Neither the word "summoned" nor Code, § 10-59 was mentioned in the motion for judgment.

Secondly, the uncontradicted evidence was that the deceased went to the scene of the fire, not under compulsion of a summons pursuant to Code, § 10-59, but as the result of a previous understanding with Brightwell, the forest warden. Brightwell, testifying as a witness for the plaintiff, was asked, with respect to his calling the deceased to "come and help" fight the fire in question, "How did you happen to call him?" Brightwell responded, "Well, he told me he would go with me to a fire anytime and he had been with me to several fires before that."

Brightwell explained that "all Fire Wardens are supposed to have some men that they can pick up most anytime to go. He stated that the deceased was "one of those . . . anytime he could go he would go."

At another point, Brightwell was asked whether the deceased "was going in voluntarily" to fight the fire in question. The warden replied, "That is right." Brightwell also testified that the wage for fighting forest fires was fifty cents an hour and that the deceased knew he was going to be paid. And the warden stated that if the deceased had expressed a desire not to fight the fire, he would not have required him to do so.

Thus, it was conclusively shown that the deceased, knowing that he was to be paid for his work, responded to the "call" to fight the fire because of his pre-existing arrangement with the forest warden that "he would go . . . anytime he could go," an arrangement free of the punitive compulsion of Code, § 10-59.

We need not decide what would be the status of a person injured while fighting a forest fire under compulsion of the summons of a fire warden pursuant to Code, § 10-59. It is clear that the deceased did not occupy such a position. It is equally clear that under the circumstances of this case, the status of the deceased with respect to the fire in question was that of a paid fireman.

This court has not had occasion previously to decide whether one who through negligence starts a fire is liable, solely because of such negligence, for injuries sustained by a fireman while attempting to suppress the fire. From an examination of the authorities, however, we find that the general, and all but unanimous, rule is that there is no such liability. See 35 Am. Jur. 2d, § 45, p. 624; 65 C. J. S., Negli-

gence, § 63 (110), p. 861; 74 C. J. S., Railroads, § 496, p. 1087, at 1092; Annotation, 86 A. L. R. 2d 1205, at 1213; and the cases cited in each.

Our research discloses that liability has been imposed in some instances for negligence creating undue risks of injury, such as hidden, unknown, and increased dangers, the hazard of which a fireman does not ordinarily assume. Where liability was found, the emphasis was said to be not upon culpability with respect to the inception of the fire, but rather upon fault in creating undue risks of injury, that is, risks beyond those inevitably involved in fire fighting. See discussion in *Krauth v. Geller*, 31 N. J. 270, 157 A. 2d 129, 131 (1960). Or, as differently expressed in another case:

". . . The law on this subject is not concerned with how the fire began or spread before the firemen arrived, but rather whether, after they arrived and undertook to fight the fire, they were subjected to risks not inevitable or inherent in fighting the fire of that kind and extent. . . ." *Jackson v. Velveray Corp.*, 82 N. J. Super. 469, 198 A. 2d 115, 121 (1964).

We have found only one case where liability was imposed for the negligence itself involved in the starting of a fire. That is the case of *Houston Belt & Terminal Ry. Co. v. O'Leary*, 136 S. W. 601 (Tex. Civ. App. 1911). Although the case may be distinguished from those falling within the general rule of non-liability because it concerned the negligent handling of fireworks, it has, nonetheless, received some criticism. See *Suttie v. Sun Oil Co.*, 15 Pa. Dist. & Co. R. 3, 7 (Cty. Ct. 1930) and Bohlen, "The Duty of a Landowner Toward Those Entering His Premises of Their Own Right." 69 U. Pa. L. Rev. 237, 252, fn. 39 (1920-21).

Some of the courts have placed their finding of non-liability upon the basis that the defendant owed no duty to exercise care to avoid creating a situation where the special services of a fireman would be required. The rationale of this view is that while one owes a duty to the public in general to refrain from negligently starting a fire, he owes no private duty to the fireman whose business it is to deal with the hazards of fire, whether or not negligently set, any such negligence being immaterial. Typical of the cases expressing this view is *Krauth v. Geller, supra*.

[2] Another basis for the rule of non-liability is that a fireman assumes the usual risks inherently involved in fire fighting. The

rationale of this view may be expressed as follows: The fireman, from the very nature of the public duty undertaken by him, is bound to aid in suppressing fires, however caused. It is well known that there is negligence present in the origin of many, if not most, fires and that there are potential dangers inherent in all. In responding to an alarm, the fireman necessarily is aware that fire is in progress and that the usual hazards are apt to exist; yet his duty so to respond is unaffected by the fact that the fire may have been created by negligence. If injured while encountering the ordinary hazards his duty requires him to confront, it is immaterial that the fire was negligently set. Typical of the cases expressing such a view is *Wax* v. *Co-operative Refinery Ass'n*, 154 Neb. 805, 49 N. W. 2d 707. (1951). See also *Bartels* v. *Continental Oil Company*, 384 S. W. 2d 667, 669 (Mo. 1964); *Buren* v. *Midwest Industries, Inc.*, 380 S. W. 2d 96, 99 (Ky. 1964); *Krauth* v. *Geller, supra*, 31 N. J. 270, 157 A. 2d 129, 130-131 (1960); *Shypulski* v. *Waldorf Paper Products Co.*, 232 Minn. 394, 45 N. W. 2d 549, 551 (1951); *Fentress* v. *Co-operative Refinery Ass'n*, 149 Neb. 355, 31 N. W. 2d 225, 227-228 (1948); *Campbell* v. *Pure Oil Co.*, 15 N. J. Misc. 723, 194 A. 873 875-876 (1937); *Buckeye Cotton Oil Co.* v. *Campagna*, 146 Tenn. 389, 242 S. W. 646, 647 (1922); *Clark* v. *Boston & M. R. R.*, 78 N. H. 428, 101 A. 795, 797 (1917); and *Lunt* v. *Post Printing & Publishing Co.*, 48 Colo. 316, 110 P. 203, 208 (1910).

The assumption of risk doctrine employed in fire cases does not depend upon the existence of a spirit of venturesomeness in the face of known danger, as is true in automobile negligence cases, but rather upon the relationship between the fireman and the public, from which arises his obligation to accept the usual risks of injury in undertaking to suppress fires without regard to whether or not they are caused by negligence.

As has been noted, the rule of non-liability is in some jurisdictions based upon a finding that one owes a fireman no duty of care to refrain from negligently starting fire. That finding emerged from a struggle by the courts to affix some label, such as trespasser, licensee, or invitee, to the status of a fireman with respect to premises where called to fight fire—a struggle quite unnecessary, it seems to us, since the fireman, because of the public nature of his rights and duties, is in a class of his own.

Even so, we perceive no persuasive reason not to follow the almost unbroken line of decisions holding non-liability to firemen for negligence in the creation of fire. We are of opinion, however, that

the more logical basis upon which to place such a holding is assumption of risk. We find the logic of that position expressed in *Wax* v. *Co-operative Refinery Ass'n, supra,* 154 Neb. 805, 49 N. W. 2d 707, 710 (1951), where quoting from the case of *Suttie* v. *Sun Oil Co., supra,* 15 Pa. Dist. & Co. R. 3 (1930), it was stated:

" 'It is a well known fact that in the great majority of instances fires originate from the negligence of those in possession of property. To impose upon an owner liability for such negligence in favor of those who voluntarily assume all the dangers growing out of so hazardous an occupation, however commendably courageous and disinterested the assumption may be, would inflict an onerous and unfair risk upon one who is deprived of all control over the other's acts, who cannot even prevent him from assuming such risks, who, for the public good, has temporarily lost all control over his property, and who is helpless to protect himself. . . .' "

The record before us shows that it is not unusual for wind to rise and cause a forest fire to "mushroom up or explode," as occurred in this case, and that any experienced fire fighter would be aware of the likelihood of such happening. The record further discloses that the deceased was an experienced fire fighter and that he "knew of the hazard of fighting fire."

There are no circumstances here to suggest that any negligent act of the defendant caused the deceased to be subjected to risks of injury beyond those inherently involved in fire fighting. We are not warranted, therefore, in applying to the situation at hand the undue-risk exception to the general rule of non-liability. Since none but the usual hazards were involved in fighting the fire in question, we hold, as a matter of law, that the deceased assumed the risk thereof.

The judgment of the trial court will be reversed, the verdict of the jury set aside, and final judgment entered here in favor of the defendant.

*Reversed and final judgment.*