Ralph CHISM and Sylvon Chism, his wife, Plaintiffs-Respondents,

v.

WHITE OAK FEED COMPANY, INC., a corporation, Defendant-Appellant,

and

A. L. Luther, Jr., Defendant.

No. 11531.

Missouri Court of Appeals, Southern District, Division Three.

Feb. 20, 1981.

John M. Beaton, Welman, Seabaugh, Beaton & Williams, Kennett, for defendant-appellant.

John Hall Dalton, Harold B. Treasure, J. Michael Mowrer, Dalton, Treasure & Mowrer, Kennett, for plaintiffs-respondents.

MAUS, Chief Judge.

The left leg of plaintiff-respondent Ralph Chism (herein called plaintiff) was amputated four to five inches above the knee as a result of injuries received when the leg became entangled in an unguarded grain auger in the bottom of an open hopper. He recovered a verdict against White Oak Feed Company, Inc. (herein called White Oak), the possessor of the grain handling and storage premises where the casualty occurred, in the amount of $250,000. His wife had a verdict in the amount of $25,000 for loss of consortium. The claims were submitted to the jury against White Oak and codefendant Luther under instructions patterned upon MAI2d Instructions 22.03 and 19.01. Liability of White Oak was predicated upon findings that: as a result of an unguarded auger the grain facility was not reasonably safe; the plaintiff did not know and by using ordinary care could not have known of this condition; and White Oak knew or by using ordinary care could have known of this condition; and White Oak failed to use ordinary care to barricade it. The claims were submitted against Luther under similar instructions except the jury was also required to find that Luther knew, or in the exercise of ordinary care should

have known, that the plaintiff did not know and by using ordinary care could not have discovered that such condition was not reasonably safe. The jury absolved Luther.

On appeal White Oak presents four points of alleged error. Only those points may be considered on appeal. *Skelton v. General Candy Co.*, 539 S.W.2d 605 (Mo. App.1976). In this court's consideration of those points the evidence must be viewed favorably to the plaintiffs with all reasonable inferences to be drawn therefrom. *Penberthy v. Penberthy*, 505 S.W.2d 122 (Mo. App.1973). The evidence will be accordingly recast, evidence favorable to White Oak being noted only where necessary for a consideration of the issues.

The grain handling and storage facility was located on the farm of Luther. It was normally used by him in his individual farming activities. However, in the fall of 1978 White Oak obtained permission of Luther, as an uncompensated and friendly gesture, to use the facility in White Oak's commercial operations. In 1978 plaintiff grew seed soybeans under a contract with and for White Oak. Upon harvesting those seed soybeans, the plaintiff was directed by White Oak to deliver the soybeans to the Luther facility.

The Luther facility was a metal building 40 feet north and south by 14 feet east and west. There were large cylindrical metal grain storage bins located on the outside of and at each corner of the metal building. The metal building was open at the north and south ends and was designed for vehicles to be driven into the building and dump grain into a trough extending east and west across the floor of the building. This trough was located approximately 14 feet from the north end of the building. The trough was approximately 4 feet wide north and south. The center 10 feet of that trough was covered by ten pipes 2⅞ inches in diameter extending east and west lengthwise of the trough. These pipes were spread apart in distances varying from 1¾ to 2¾ inches and were not precisely parallel to the sides of the trough. As the pipes were placed they formed a pipe grate over the center 10 feet of the trough. The pipe grate terminated approximately 2 feet from each wall of the building. At each end of the pipe grate there was located a grain pit or hopper.

At the bottom of the trough a grain auger extended across the building. This auger had a screw blade and when rotated, it conveyed grain through the trough to the hopper on the west side of the building. On the east side, the auger terminated after extending into the bottom of the hopper approximately 1 foot. Details concerning the extension of the auger into the hopper on the west side are not shown in the evidence.

The open area on the east side of the building was approximately 4 feet north and south by 2 feet east and west. Plates extended down from each side of the top of the open area to the level of the top of the grain auger, forming a hopper. These plates tapered toward the center of the bottom of the hopper so that the opening over the auger was 9¼ inches north and south by 14½ inches east and west. In effect the hopper was a pit 2 feet by 4 feet at the top and 14½ inches by 9¼ inches at the bottom. The bottom was open and immediately beneath it was an exposed portion of the auger. On each side, bin augers entered the building and terminated over each hopper so they could be used to carry grain to and from the hoppers. The bin augers when not in use terminated approximately in the center of the hopper and at some appreciable distance above the top of the hopper. On the west side of the building, a metal shield was placed at the west end of the pipe grate between the pipe grate and the hopper. This shield was approximately 1 foot in width and was vertical except it angled slightly toward the side of the building. A pillar supporting the facility on the exterior of the building extended into the west hopper. The open areas on either side of the pillar were covered with an expanded metal grate.

On the east side of the building there was no vertical metal shield between the pipe grate and the hopper. There was no pillar extending into the hopper on the east side of the building. The entire top of the hopper on the east side was open.

As the grain auger extended across the building, it was covered by an inverted v-shaped metal shield placed in such a manner that grain could pass underneath each side of the shield and between the tapered wall of the trough to reach the auger. However, this metal shield did not extend over the auger in the bottom of the hopper on the east side. As admitted by White Oak witness Owens, who designed and constructed the facility, the 14½ by 9¼ inch opening at the bottom of the hopper on the east side was the only place in the facility that an auger was unguarded. The plaintiff presented evidence of five methods by which this portion of the auger could have been guarded, including the extension of the inverted metal shield over the auger at a cost of approximately $40.00. Plaintiffs' expert had observed seven commercial grain handling facilities in the community with no unguarded augers. White Oak presented evidence of various reasons why the suggested guarding of the auger would to some extent interfere with the operation of the facility and evidence that at least some farm grain handling facilities had unguarded augers.

By October 16, 1978, the plaintiff delivered two loads of soybeans to the facility in a grain buggy pulled by a pickup truck. The pickup truck was approximately 2 feet wider than the grain buggy which was estimated to be 5 or 6 feet wide. The soybeans were unloaded by stopping the grain buggy over the pipe grate and opening a gate on the east side of the grain buggy permitting the grain to fall into the pipe grate. On each occasion he was accompanied by the manager of White Oak who operated the machinery and attended to the unloading. On each occasion plaintiff got out of his pickup and moved about in the facility, although he was unable to detail his movements. On at least one occasion he stood behind or to the north of the grain buggy as it was unloaded. On October 17, 1978, the plaintiff delivered one load of soybeans in the same manner.

Later in the day, on October 17, 1978, the plaintiff delivered a fourth load of soybeans to the facility. This load was delivered in a "10-wheeler" truck with a bed that raised, owned by White Oak. The bed of this truck was approximately 8 feet wide. The truck was driven by the plaintiff and he was again accompanied by the manager of White Oak. The truck was driven in the north end of the building and stopped with the rear of the bed over the pipe grate. This meant that the open hopper was on the driver's side of the truck. After the truck was parked, the manager opened a gate in the rear of the bed to permit beans to fall into the pipe grate. At this time the plaintiff was standing to the rear of the truck, on the north side of the pipe grate. He could not recall the route by which he got there nor whether he was standing to the right or the left side of the rear of the truck. The manager was also standing to the rear of the truck. In a few minutes the beans stopped falling through the gate. The manager said he was going to raise the bed of the truck. The manager then walked forward, along the east side of the truck, between the truck and the open hopper and got in the cab. The plaintiff was unable to recall what he did. The plaintiff speculated that he might have intended to give the manager a signal. After seeing the manager walk forward, the plaintiff's next recollection is having his left leg entangled in the auger in the bottom of the open hopper. He could not recall how his leg got into the hopper and into the auger. Before the manager had started the truck, he heard the plaintiff yelling and he got out, stopped the machinery and took the plaintiff to the hospital.

Of course, there was conflicting testimony concerning the visibility of the open end

of the unguarded auger. White Oak presented evidence that the open hopper was plainly visible upon entering the building, that it was open and obvious. White Oak also presented evidence that when a person was standing adjacent to the open hopper, at least within 3 feet, the unguarded auger was plainly visible. The plaintiffs' evidence concerning the open hopper was that it was obscured by the bin augers extending over the hopper. The plaintiffs' evidence concerning the auger at the bottom of the hopper was that it could not be seen unless a person was adjacent to the hopper and looking directly down. There was also evidence that the light in the bottom of the hopper made it difficult to see the unguarded auger. The parties introduced in evidence 21 photographs of the facility, including 15 featuring the open hopper of which 6 were taken at such an angle as to show the unguarded auger. The plaintiff had farmed all of his life, had been familiar with farm machinery, knew how elevators operated and at the time of the occurrence knew that machinery was in motion and augers were turning. Previously, he had delivered his crops to White Oak's commercial facility, which the evidence showed had no unguarded augers. He had used unloading augers on combines but, "they was all covered up though". In response to a question concerning when he first saw the open hopper, the plaintiff stated, "[w]ell, when I really saw it is when I was coming out of the hole there and Johnny helped me out of there. To bring it to a point to see it, I never seen the hole." As heretofore noted, he did not know what caused him to get into the unguarded auger.

White Oak's first point is that the trial court erred in overruling its motion for a directed verdict because the hopper and auger were so open and obvious it was under no duty to barricade the unguarded auger. At the outset, it should be noted that because of the difference in their positions, a possessor of land may be, and often is, held to have knowledge of and appreciate a risk an invitee is not held to know and appreciate. *Harbourn v. Katz Drug Company*, 318 S.W.2d 226 (Mo.1958); *Brice v. Union Elec. Co.*, 550 S.W.2d 629 (Mo.App.1977). This is also true in respect to the determination of the contributory negligence of an invitee. *Bollman v. Kark Rendering Plant*, 418 S.W.2d 39 (Mo.1967). In this case, White Oak did not submit the affirmative defense of contributory negligence but relies upon its position that it was under no duty and was not negligent. The plaintiff, although not conceding the hopper was open and obvious, contends the decisive point is whether or not the unguarded auger was open and obvious. This position is mandated because the case was submitted upon a finding "there was an unguarded auger". There is, even assuming the hopper was open and obvious, squarely presented the question of whether or not White Oak owed the plaintiff a duty in respect to the unguarded auger.

The cases dealing with the liability of possessors of land to invitees are legion. In general, the liability of possessors is based upon their superior knowledge of the condition. In the older cases, this was often expressed: "The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care." *Hokanson v. Joplin Rendering Company, Inc.*, 509 S.W.2d 107, 111 (Mo.1974). In the recent cases, a more frequent expression of the possessors' liability has been: " 'Fundamentally, the basis of a proprietor's liability in a case of this nature is his superior knowledge of the defective condition of his premises which results in injury to his business invitee.' " *Hokanson v. Joplin Rendering Company, Inc.*, supra, 509 S.W.2d at 110.

It has been observed "each case depends on its own circumstances. There is no precise formula by which to determine whether or not a condition is so 'open and obvious'

one is bound to see it." *Shannon v. Washington University*, 575 S.W.2d 235, 237 (Mo. App.1978). In the resolution of this case, several unique facts must be noted. The condition of the unguarded auger was independent from the condition of the open hopper. Even if the open hopper could be found to demonstrate to the plaintiff the presence of an auger at the bottom of the hopper, the evidence did not compel a finding that it demonstrated the existence of an *unguarded* auger, presenting a highly dangerous condition. The harm in this case did not result solely from the open hopper, but could be found not to have occurred but for the unguarded auger.

Pertinent standards defining the duty of a possessor are set forth in Restatement of Torts 2d, Condition and Use of Land, §§ 343 and 343 A(1) (1965).[1]

For the application of § 343 to the unique facts of this case, the key phrase in that section is "for physical *harm caused* to his invitees *by a condition* on the land." (Emphasis ours). The key phrase of § 343 A(1) is "for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them." The duty of the possessor is further defined in two comments to § 343 A applicable to this case.[2]

It is apparent in these sections the "condition" referred to is a condition that causes the harm, in this case the exposed auger. It is a far different thing to know or to be held to know there is an open hopper than to know or to be held to know that at the bottom of that hopper is an unguarded, highly dangerous piece of machinery. Only the possession of the latter knowledge would enable an invitee to appreciate the gravity of the threatened harm and to make an intelligent choice as to whether

---

1. While these sections have not been expressly adopted by our Supreme Court in defining the duty of a possessor, they have been relied upon for guidance in countless decisions. *Hokanson v. Joplin Rendering Company, Inc.*, 509 S.W.2d 107 (Mo.1974); *Albers v. Gehlert*, 409 S.W.2d 682 (Mo.1966); *Dixon v. General Grocery Company*, 293 S.W.2d 415 (Mo.1956); *Kelly v. Dairy Queen Enterprises, Inc.*, 581 S.W.2d 903 (Mo.App.1979); *Wright v. Interco, Inc.*, 567 S.W.d 149 (Mo.App.1978); *Larrea v. Ozark Water Ski Thrill Show, Inc.*, 562 S.W.2d 790 (Mo.App.1978); *Gary v. Federal Barge Lines, Inc.*, 550 S.W.2d 609 (Mo.App.1977); *Lott v. Anheuser-Busch, Inc.*, 481 S.W.2d 517 (Mo. App.1972); *Weber v. Hinds*, 440 S.W.2d 129 (Mo.App.1969); *Vinyard v. Vinyard Funeral Home, Inc.*, 435 S.W.2d 392 (Mo.App.1968). These sections read as follows:

§ 343. Dangerous Conditions Known to or Discoverable by Possessor
A possessor of land is subject to liability for physical harm to his invitees by a condition on the land if, but only if, he
(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
(c) fails to exercise reasonable care to protect them against the danger.
§ 343 A. Known or Obvious Dangers
(1) A possessor of land is not liable to his invitees for physical harm caused to them by

any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

2. b. The word 'known' denotes not only knowledge of the existence of the condition or activity itself, but also appreciation of the danger it involves. Thus the condition or activity must not only be known to exist, but it must also be recognized that it is dangerous, and the probability and gravity of the threatened harm must be appreciated. 'Obvious' means that both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception, intelligence, and judgment.
e. In the ordinary case, an invitee who enters land is entitled to nothing more than knowledge of the conditions and dangers he will encounter if he comes. If he knows the actual conditions, and the activities carried on, and the dangers involved in either, he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the land.

the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the land.

No cases dealing with this precise point have been cited or found. However, the conclusion reached is supported by several cases. In *Harbourn v. Katz Drug Company*, supra, scales sitting at the side of a door were open and obvious, but the fact the door was locked was not. Under these circumstances the court approved recovery by an invitee who, upon finding the door locked, turned to go to an adjoining door and fell over the scales. In so holding, the court said: "Therefore, it was not the position of the scale alone that created the unreasonable risk, but it was the combination of the locked set of doors and the location of the scale with its platform directly in the path of a customer who had been required by reason of the locked doors to change his course of travel in leaving the store." *Harbourn*, 318 S.W.2d at 229. In *Bartels v. Continental Oil Company*, 384 S.W.2d 667 (Mo.1964), a fireman fighting a petroleum storage fire was killed when an improperly vented tank rocketed from its base. In approving a judgment for the plaintiff, the court said: "While Bartels was an experienced fireman and was therefore necessarily aware of some of the hazards of petroleum products fires, there is no fact or circumstance indicative of any knowledge on his part that these particular storage tanks were equipped with inadequate safety vents." *Bartels*, 384 S.W.2d at 671. In *Brice v. Union Elec. Co.*, supra, an invitee walking through a pipe yard, the whole area of which was covered with miscellaneous materials and objects, was permitted to recover when he stepped on a nail in a board. In that case the court observed that "his knowledge of the general condition from which the danger arose did not necessarily constitute knowledge and appre-

ciation of the danger actually encountered." *Brice*, 550 S.W.2d at 632.[3]

The duty of a possessor is said to bear a strong resemblance to the question of whether or not an invitee has been guilty of contributory negligence. *Daniel v. Childress*, 381 S.W.2d 539 (Mo.App.1964); 62 Am.Jur.2d Premises Liability § 71 (1972). Clearly, in order to charge an invitee with contributory negligence in entering or moving about in a building in which there is an unguarded auger, it is necessary that he know or be held to know the extent of the risk involved. *Koirtyohann v. Washington Plumbing & Heating Co.*, 471 S.W.2d 217 (Mo.1971); *Davidson v. International Shoe Company*, 427 S.W.2d 421 (Mo.1968); *Brice v. Union Elec. Co.*, supra. Also see Restatement of Torts 2d, Standard of Conduct, §§ 291 and 293 (1965). A significant factor in this case was the extent of the harm likely to be caused by the condition. Again, it is a far different thing to risk a bruised shin or even a broken leg from an open hole than to risk amputation by an unguarded auger. As one member of this court observed, one should not be held to expect a tiger in a doghouse.

■ There was evidence that the unguarded auger was visible only when the viewer was standing immediately adjacent to the hopper looking down. For example, one witness testified you could see the hopper when so looking at it when standing within three feet of the hopper, but he didn't know about four feet. Photographs show the auger to be of similar color to the surrounding material. Photographs taken in normal light which would show the auger, if there had been sufficient illumination, do not do so. The unguarded auger was not so open and obvious the plaintiff, as a matter of law, was charged with knowledge of the condition and that question was properly submitted to the jury.

---

**3.** Also compare *Davidson v. International Shoe Company*, 427 S.W.2d 421 (Mo.1968) where the plaintiff could not be held to know of danger in failing to step in the center of portable steps as distinguished from the danger of missing a step; and *Larson v. Atchison, T. & S. F. Ry. Co.*, 364 Mo. 344, 261 S.W.2d 111 (1953) in which a warning that a catcher bar worked hard did not import notice it was bent.

Perhaps the liability of the possessor in this case could be more clearly defined from the standpoint of proximate cause. Under such an analysis, the question is whether or not the step or fall into the open hopper was an intervening cause insulating White Oak from liability. Under remarkably similar circumstances, relying upon Restatement of Torts 2d, Legal Cause, §§ 431 and 432 (1965), the Supreme Court has held that a fall upon an open and obviously defective floor was not an intervening cause which insulated the possessor from liability for injury sustained when in the act of falling an invitee grabbed a defective bar which loosened and permitted him to fall. *Giles v. Moundridge Milling Co.*, 351 Mo. 568, 173 S.W.2d 745 (1943).

In speaking of the determination of proximate cause, it has been said: "There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion." Prosser on Torts, Causation in Fact, § 41. Standards for the determination of proximate cause are set forth in Restatement of Torts 2d, Legal Cause, §§ 430 to 433 (1965).[4] Beyond question the unguarded auger was a substantial factor in bringing about the amputation.

Many factors are involved in determining if an intervening force or act is a superseding cause that insulates a defendant from liability. Important considerations for determining whether or not an intervening force or act is a superseding cause are set forth in § 442, including subsection c which provides: "[T]he fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation." Also pertinent are §§ 442 A, 442 B and 443.[5] In connection with § 443, Comment b provides: "'Normal' consequences. The word 'normal' is not used in this Section in the sense of what is usual, customary, foreseeable, or to be expected. It denotes rather the antithesis of abnormal, of extraordinary." The fact an intervening act may be one of contributory negligence does not per se cause that act to be an insulating superseding cause. Restatement of Torts 2d, Legal Cause, § 447 (1965).

■ In this case the condition of the unguarded auger increased the risk of harm through the intervention of another force, the act of getting in the hopper. That intervening force caused the same harm risked by that condition. The intervening force did not operate independently from the unguarded auger and under the circumstances becoming entangled in the unguarded auger was not an extraordinary, in the sense that word is used above, result of that situation.

White Oak's second point is that the trial court erred in overruling its motion for a

---

4. § 431. What Constitutes Legal Cause
The actor's negligent conduct is a legal cause of harm to another if
  (a) his conduct is a substantial factor in bringing about the harm, and
  (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.

5. § 442 A. Intervening Force Risked by Actor's Conduct
Where the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause.
§ 442 B. Intervening Force Causing Same Harm as That Risked by Actor's Conduct

Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.
§ 443. Normal Intervening Force
The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about.

directed verdict because there was no evidence that its failure to barricade the auger was the proximate cause of the injury. This point is premised upon the fact that there was no evidence of how or what caused the plaintiff to get into the hopper and auger. From the argument under this point it is apparent White Oak is referring to causation in fact rather than the limitations imposed by the legal doctrine of proximate cause, which has been discussed. For the distinction see Prosser on Torts, § 41. The test widely adopted for a determination of causation in fact is whether or not the injury would have occurred in the absence of the negligent act, the "but for" rule, Prosser on Torts, § 41. This test has been consistently applied in this state. "The 'usual test as to causal connection is whether the facts show that absent the negligent act, the injuries would not have been sustained.'" *Votrain v. Illinois Terminal R. Co.*, 268 S.W.2d 838, 843 (Mo. banc 1954). Also see *Dintelman v. McHalffey*, 435 S.W.2d 633 (Mo.1968); *Beineke v. Terminal Railroad Ass'n of St. Louis*, 340 S.W.2d 683 (Mo.1960); *Thomas v. Missouri Power & Light Co.*, 562 S.W.2d 412 (Mo.App.1978); *Levin v. Sears, Roebuck & Co.*, 535 S.W.2d 525 (Mo.App.1976).

■ Of course, "that causal connection must be proved, but direct proof of the connection is not required, it being sufficient that facts proved are of such nature and so connected and related that the conclusion of causal connection may be fairly inferred." *James v. Sunshine Biscuits, Inc.*, 402 S.W.2d 364, 372 (Mo.1966). Or, stated in another way, "[t]he causal connection between the negligent act or omission and the injury may be inferred from facts and circumstances in the light of ordinary experience and common sense." *Thomas*, 562 S.W.2d at 415. Also see *Ogden v. Toth*, 542 S.W.2d 17 (Mo.App.1976); *Joiner v. Kurt's Chip-A-Way Park, Inc.*, 510 S.W.2d 773 (Mo. App.1974); *Derboven v. Stockton*, 490 S.W.2d 301 (Mo.App.1972). The term "barricade" is defined in Webster's New Collegi-

ate Dictionary as "(1) to block off or stop up with a barricade (2) to prevent access to by means of a barricade". In this case, in the light of ordinary experience or common sense, the jury could reasonably find that regardless of how the plaintiff got into the hopper, there was a causal connection between the failure to barricade the auger and the injuries. Compare *Swanson v. Godwin*, 327 S.W.2d 903 (Mo.1959); *Thomas.*

The instruction authorizing a verdict for the plaintiff against White Oak concluded with the following required finding: "Fifth, such failure either directly caused damage to plaintiff Ralph Chism or combined with the acts of Defendant A. L. Luther, Jr., to directly cause damage to plaintiff Ralph Chism." The instruction authorizing a verdict for his wife concluded in similar fashion. This modification of MAI 22.03 is patterned upon the third alternative provided by MAI 19.01.

White Oak's third point is that the trial court erred in giving these instructions for the reason (1) White Oak and Luther could not have been joint tort-feasors and therefore such modification by MAI 19.01 was improper, and (2) by the use of the terms "combined with the acts of defendant A. L. Luther, Jr.," allowed the jury to speculate as to what acts of Luther were to be considered.

■ V.A.M.R. Civil Rule 70.03 in part provides: "Specific objections to instructions shall be required in motions for new trial unless made at trial." Neither at the trial nor in its motion for a new trial did White Oak object to these instructions because White Oak and Luther could not have been joint tort-feasors. Without considering the substance of that objection first raised in the brief, it is sufficient to say that such objection may not now be considered. *Chambers v. Kansas City*, 446 S.W.2d 833 (Mo.1969).

By its second objection, White Oak contends the reference to the acts of Luther allows the jury to speculate concerning

what acts are referred to and has the effect of shifting the burden of proof from plaintiff. To support that position White Oak relies upon *Daniels v. Smith*, 471 S.W.2d 508 (Mo.App.1971). That case involved an issue of whether or not a plaintiff in a two-vehicle collision had been thrown from her vehicle when it was hit by a third vehicle driven by the defendant. The court rejected an instruction authorizing a verdict upon a finding that the negligence of the defendant caused the collision of his vehicle instead of a finding that such negligence caused the injury to the plaintiff. In so holding, the court observed that the rejected instruction would have relieved the plaintiff of proving that she was in her car when it was hit by the defendant's vehicle. *Daniels* does not support White Oak's contention in this case.

■ That contention is unsound. The modification of MAI 22.03 was a modification authorized by MAI 19.01. A similar modification was approved in *Gathright v. Pendegraft*, 433 S.W.2d 299 (Mo.1968). The language, "acts of defendant Luther" in the context of all of the instructions have reference to the actions referred to in the verdict-directing instructions against defendant Luther. However, it is not necessary that the acts of another person involved in an occurrence be so defined. Such a modification "may be used whether or not the other tort-feasor is a party." MAI 19.01 Note on Use 1. The instructions clearly required the jury to find that the failure of White Oak directly caused or contributed to cause the injury. White Oak was in no way prevented by these instructions from presenting its defense. *Steele v. Yacovelli*, 419 S.W.2d 477 (Mo.App.1967). The trial court did not err in giving these instructions and this point is denied. *Gathright.*

White Oak's fourth point is based upon the size of the verdict for the plaintiff. White Oak presents no argument concerning the size of the verdict for the plaintiff's wife and that verdict will not be considered. The plaintiff was 56 years old at the time of the trial which was ten months after the date of the accident. Immediately following his injury, the plaintiff's left leg was amputated above the ankle. A gangrenous condition developed and later the leg was amputated 4 or 5 inches above the knee. He returned home after 22 days in the hospital. He was bedfast for a time and then moved about on crutches. In February, 1979, he was fitted with an artificial limb. He is able to walk with that limb, but has fallen frequently and uses a cane. At the time of the trial he was yet suffering from phantom pain in his left leg and foot. The pain was not as severe as it once was, but he stated he was never without pain. The plaintiff graphically described his difficulty in use of the artificial leg and the discomfort and inconvenience attending its use. He also portrayed the difficulty of daily life with one leg and his need for daily assistance.

In November, 1976, the plaintiff was hospitalized for a heart attack. He improved but continued to have a "heart problem" and hypertension. He was a borderline diabetic. After being admitted to the hospital following his injuries, the plaintiff suffered a second heart attack. He presented medical evidence that a person who has a second heart attack is more apt to have another attack and that amputees suffer more heart attacks than others. The undisputed medical evidence was that he was totally and permanently disabled.

The plaintiff had farmed all of his life. At the time of his injuries and for sometime before that, he farmed 500 acres of rented land. In 1977 he farmed but did little work himself. In 1978 he did more work, but still acted more or less as a supervisor. His net income was shown to be approximately as follows: 1976—$2,600 loss; 1977—$14,000 profit; 1978—$11,000 profit. After his injuries he gave up his rented land. His life expectancy was shown to be 16.72 years. One doctor, without further specificity, said that by reason of his condition, the plaintiff had less than an average life span. His medical expenses were $8,781.

White Oak's argument of excessiveness is primarily based upon the doctrine of uniformity of judgments, relying upon *Carnes v. Kansas City Southern Railway Co.,* 328 S.W.2d 615 (Mo.1959). While *Carnes* also involved a 56 year old man who had prior physical ailments and suffered a leg amputation, that case is to be distinguished. *Carnes* was based primarily on the doctrine of uniformity, which will be hereafter discussed. Further, in *Carnes* the court carefully noted the evidence did not warrant an inference the plaintiff was totally disabled from performing any gainful work.

The status of the doctrine of uniformity has been succinctly set forth as follows: "Thus, what has emerged from the case law is a standard of reasonableness of the verdict to be determined by the appellate court taking into consideration all of the various factors that the courts have recognized as affecting the issue of reasonableness and utilizing as only *one of those factors the notion of uniformity* with comparable injuries." *Ricketts v. Kansas City Stock Yards of Maine,* 537 S.W.2d 613, 619 (Mo.App. 1976). (Emphasis Added). The standard for review of the excessiveness of a verdict has been declared by the Supreme Court to be as follows:

> There is no precise formula for determining whether a verdict is excessive; each case must be considered on its own facts. Consideration is given to the nature and extent of the injuries and the diminished earning capacity, economic conditions, plaintiff's age, and a comparison of the compensation awarded and permitted in cases of comparable injuries. . . . The ultimate test is what fairly and reasonably compensates plaintiff for the injuries sustained. *Graeff v. Baptist Temple of Springfield,* 576 S.W.2d 291, 309 (Mo. banc 1978). (Citations omitted).

The determination of plaintiff's damages was primarily an issue for the jury. *McGowan v. Hoffman,* 609 S.W.2d 160 (Mo.App.1980). When the question of excessiveness has been submitted to a trial court, this court is to determine if " 'the trial court has abused its discretion in ordering a remittitur, or in failing to order a remittitur, or in the amount of remittitur ordered . . . .' " *Morris v. Israel Brothers, Inc.,* 510 S.W.2d 437, 447 (Mo.1974). In giving due regard to the factor of uniformity, this court has considered other cases with due cognizance of the spiraling inflation. Among the cases considered are *Shepard v. McGougan,* 562 S.W.2d 678 (Mo. App.1977); *Blond v. Overesch,* 527 S.W.2d 663 (Mo.App.1975); *Sanders v. H & S Motor Freight, Inc.,* 526 S.W.2d 332 (Mo.App.1975). Considering the plaintiff's age, injuries, pain and suffering, permanent total disability, medical expenses, loss of earnings and related matters, the size of the verdict, while liberal, measured by the above standards is not excessive. White Oak's fourth point is denied and the judgment is affirmed.

BILLINGS, P. J., and PREWITT, J., concur.