PHILIP MORRIS INCORPORATED

v.

GARRY LEE EMERSON, ET AL.

Record No. 841374

PHILIP MORRIS INCORPORATED

v.

HUBERT C. MENTZ, ET AL.

Record No. 841385

PHILIP MORRIS INCORPORATED

v.

EDWARD J. SAWYER, ETC., ET AL.

Record No. 841405

BONNIE JEAN GORE

v.

PHILIP MORRIS INCORPORATED, ET AL.

Record No. 841549

TEXACO, INC.

v.

HUBERT C. MENTZ, ET AL.

Record No. 841560

A-LINE INDUSTRIES, INC.

v.

GARRY LEE EMERSON, ET AL.

Record No. 841564

April 22, 1988

Present: Poff, Compton, Stephenson, Russell and Whiting, JJ., Gordon and Cochran, Retired Justices

*Lewis T. Booker (G.H. Gromer, Jr.; Hunton & Williams,* on briefs), for appellant.

*Terrence R. Batzli; James J. Burns; E. Lewis Kincer, Jr.; Frank N. Cowan (Theodore J. Markow; James D. Davis; Leslie D. Campbell, Jr.; Howard W. Dobbins; William A. Young, Jr.; Alexander N. Simon; G. Kenneth Miller; W. Joseph Owen, III; Mays, Valentine, Davenport & Moore; Wallerstein, Goode & Dobbins; May & Miller, P.C.; Cowan & Owen; Crews, Hancock & Dunn; McCaul, Grigsby, Pearsall, Manning & Davis; Campbell and Campbell,* on briefs), for appellees.

386

*Lewis T. Booker (G. H. Gromer, Jr.; Hunton & Williams*, on briefs), for appellant.

*Christopher M. Malone; James J. Burns; E. Lewis Kincer, Jr.; Frank N. Cowan (John B. Thompson; John C. Shea; Howard W. Dobbins; William A. Young, Jr.; Alexander N. Simon; G. Kenneth Miller; W. Joseph Owen, III; Thompson & McMullan; Marks, Stokes & Harrison; Wallerstein, Goode & Dobbins; May & Miler, P.C.; Cowan & Owen*, on briefs), for appellees.

*Lewis T. Booker (G. H. Gromer, Jr.; Hunton & Williams*, on briefs), for appellant.

*James J. Burns; E. Lewis Kincer, Jr.; Frank N. Cowan (Howard W. Dobbins; William A. Young, Jr.; Alexander N. Simon; G. Kenneth Miller; W. Joseph Owen, III; Leonard C. Pederson, Jr.; Wallerstein, Goode & Dobbins; May and Miller, P.C.; Cowan & Owen; Schulze, Sorrell & Pederson, P.C.,*, on briefs), for appellees.

*James D. Davis (McCaul, Grigsby, Pearsall, Manning & Davis*, on briefs), for appellant.

*G. H. Gromel, Jr.; James J. Burns (Lewis T. Booker; Howard W. Dobbins; William A. Young, Jr.; Alexander N. Smith; Hunton & Williams; Wallerstein, Goode & Dobbins*, on briefs), for appellees.

*Howard W. Dobbins; James J. Burns (William A. Young, Jr.; Alexander N. Simon; Wallerstein, Goode & Dobbins, on briefs), for appellant.*

*Christopher M. Malone; James D. Davis; E. Lewis Kincer, Jr.; Frank N. Cowan (John B. Thompson; Terrence R. Batzli; Leslie D. Campbell, Jr.; Theodore J. Markow; John C. Shea; Lewis T. Booker; G. H. Gromer, Jr.; G. Kenneth Miller; W. Joseph Owen, III; Leonard C. Pederson, Jr.; Thompson & McMullan; McCaul, Grigsby, Pearsall, Manning & Davis; Mays, Valentine, Davenport & Moore; Campbell and Campbell; Crews, Hancock & Dunn; Marks, Stokes & Harrison; Hunton & Williams; May & Miller; Cowan & Owen; Schulze, Sorrell & Pederson, P.C., on briefs), for appellees.*

*Frank N. Cowan (W. Joseph Owen, III; Cowan & Owen, on brief), for appellant.*

*James D. Davis (Theodore J. Marlow; Terrence R. Batzli; Leslie D. Campbell, Jr.; John B. Thompson; Christopher M. Malone; John C. Shea; Leonard C. Pederson; McCaul, Grigsby, Pearsall, Manning & Davis; Crews, Hancock & Dunn; Mays, Valentine, Davenport & Moore; Campbell & Campbell; Thompson & McMullan; Marks, Stokes & Harrison; Schulze, Sorrell & Pederson, P.C., on briefs), for appellees.*

WHITING, J., delivered the opinion of the Court.

## I. *FACTS*

From the early 1960's to 1969, Texaco, Inc. (Texaco) conducted experiments on rocket fuels and filaments in a laboratory

facility it owned in Richmond, using a liquid known as pentaborane. Pentaborane is highly toxic to humans; a pharmacologist who had investigated the characteristics and effects of pentaborane for the United States Air Force, described it as a "supertoxic" chemical. Brief exposure to five parts of pentaborane to a billion parts of air is fatal. Pentaborane is 2,000 times as deadly as hydrogen cyanide, the gas commonly used for execution in gas chambers. A dose of pentaborane sufficient to cause death is scarcely more than a dose which causes no harm. Indeed, if the odor of the compound is sufficiently strong to be detected by humans, minimal exposure to the gas is fatal.

Pentaborane is highly reactive to oxygen and will ignite when it reaches a concentration of about 2% in air. Both the liquid and the vapors from pentaborane cause serious bodily injury. Any person working with pentaborane gas should either use chemical hoods capable of isolating the pentaborane gas or wear a self-contained breathing apparatus. Taking special precautions, the United States government and its contractors have used and disposed of large quantities of pentaborane in its space rocket program without injury.

Texaco obtained pentaborane in small, pressurized cylinders approximately eight to 12 inches long and two to three inches in diameter. When pentaborane is under pressure, special care must be taken to contain the liquid chemical to prevent it from vaporizing rapidly into the atmosphere. Texaco buried chemicals in 19 pressurized cylinders, at least three of which contained pentaborane, with a number of other chemicals in a pit near one of its Richmond laboratory buildings. Burial of such cylinders is considered a dangerous practice because there is a risk that the cylinders will deteriorate and leak, allowing the contents to escape, and because the cylinders later may be dug up and the contents accidentally released by persons attempting to dispose of them.

Texaco sold its Richmond facility to Philip Morris Incorporated (Philip Morris) in 1978, but failed to disclose to Philip Morris that it had buried chemicals in a number of pits on the property. Some time later, Texaco advised Philip Morris of the chemical burials, but did not reveal that the pits contained pressurized cylinders.

In August of 1980, when Philip Morris began constructing another building on the property, its excavating contractor uncov-

ered chemical waste, including the 19 cylinders, in the burial pits. After the cylinders were removed from the pits, they were taken to the laboratories of Environmental Laboratories, Inc. (ELI) at another location in the Richmond area. When the cylinders were cleaned, many of them were found to be corroded. Thirteen cylinders had no labels identifying the contents, but six were marked as follows: two were labeled B5H9 (the chemical formula for pentaborane), two were labeled BCL3 (the chemical formula for borane trichloride), one was labeled 1-defluoro-2, 2-dichloro-ethylene, and one was labeled fluorine. The cylinders were assumed to contain chemicals under pressure. All chemical experts in these cases agreed that a cylinder with unknown contents should be treated as if it contained the most dangerous chemicals known.

When Philip Morris contacted Texaco for assistance in identifying and disposing of these cylinders, Texaco researched its files and gave Philip Morris the minimal information it found, but refused to assist further unless Philip Morris would execute "a hold-harmless agreement and give recognition that Texaco [was] not legally obligated to perform such service." Philip Morris did not execute such an agreement. Except for giving some subsequent information on the contents of some of the cylinders to one of Philip Morris' contractors who was attempting to deal with the cylinders, Texaco did nothing further to assist in identifying or disposing of the chemicals. Texaco never notified Philip Morris, or any of its contractors, that any cylinder contained pentaborane.

For 15 months after their discovery, the cylinders remained at ELI while Philip Morris and two of the companies it hired to remove the chemicals from its premises unsuccessfully attempted to find a contractor willing to dispose of them. None of the disposal firms would accept the job without knowing the contents of the cylinders because federal safety regulations require the disposal firms to obtain this information before transporting toxic chemicals to another location for disposal. The contents of the pressurized cylinders could not be ascertained without extracting a small sample from each cylinder under controlled conditions for testing. Because the valves on many of the cylinders were corroded, it was feared that the valves would not close after they had been opened for sampling.

To avoid transporting the cylinders, a member of one of the waste disposal firms suggested disposal by exploding the contents

on the premises of Philip Morris. Although this is an accepted method of disposal, Philip Morris rejected the proposal because it considered its property to be an unsatisfactory location for exploding the cylinders. Philip Morris continued to seek to have the chemicals neutralized at a location off its premises.

Browning-Ferris Industries (BFI), a large waste disposal firm, ultimately gave William Saddington, the chemical engineer at Philip Morris in charge of the disposal of the chemicals, the names of two companies that might be able to assist Philip Morris. BFI made no representations concerning those companies' capabilities or experience, assuming Philip Morris would make the appropriate investigation.

Saddington contacted A-Line Industries (A-Line), one of the two firms whose names BFI had furnished, and James Kachur, one of the two owners of A-Line, came to Richmond to confer with Saddington. After looking at the cylinders and measuring them, Kachur gave Saddington a brochure describing A-Line's previous activities and experience and told Saddington he had developed a device for the opening and sampling of the contents of deteriorated cylinders, prior to their neutralization and disposal.

The device was a heavy duty pipe 12 inches in diameter with a heavy duty flange welded into the top, which contained a removable top equipped with a valve and pressure gauge. A half-ball with a valve in it was welded to the bottom of the pipe. Another flange was inserted in the side of the pipe, which permitted a hydraulic plunger to be inserted into the pipe. When the top was sealed and all valves were closed, the pipe became an air-tight chamber. The small cylinders were to be placed in cradles designed to adapt to their various sizes (with the valve positioned opposite the hydraulic plunger) and inserted into the chamber. The hydraulic plunger or ram would then sever the valves of the cylinders and allow their contents to escape into the sealed chamber. The contents of the sealed chamber could be sampled by releasing a small amount of the chemical into a container through a valve at the bottom of the chamber. There was no integral mechanism for isolating the contents from the air after the sample came through the valve.

The chamber was intended to be a diagnostic tool for determining the contents of each cylinder. After the identity of the contents was determined, further action outside the chamber would be required to neutralize the chemical.

A few days before he came to Virginia, Kachur demonstrated the use of the chamber, using a non-hazardous gas, to George R. Weiss, the principal official in the State of New Jersey dealing with the handling, identification, and disposal of hazardous chemicals. Kachur hoped his chamber would be used to identify the unknown contents of a number of pressurized cylinders in the possession of the State of New Jersey. Weiss told Kachur that the testing device was not sufficiently developed for use. Weiss recommended substituting gaskets which were resistant to corrosive chemicals, as well as installing separate, *self-contained* manifold systems with the appropriate valves and devices to further analyze the chemical being tested. Weiss also warned Kachur that any person standing near the cylinder should be in a self-contained air mask until the material was identified. Weiss also suggested that Kachur conduct a number of tests on low-level toxic materials to check for potential pressure leaks to insure that the chamber could be safely used as a testing device for toxic chemicals.

Kachur told Weiss that he was going to Virginia in a few days to use the equipment on cylinders similar to those in New Jersey, and "hard technical data would be available soon." When Kachur mentioned that he would be dealing with diborane, a toxic boron compound related to pentaborane, but not as dangerous, Weiss warned him that "that stuff is bad," and Kachur said he would be careful.

Initially, Kachur suggested to Saddington that he would use the chamber to obtain a sample of the substance in each cylinder and then would analyze the samples, if necessary, to determine what they were in order to select the appropriate neutralizing agent, and Saddington agreed. Neither man discussed a method of isolating the sample from the air after it was drawn from the chamber. After Kachur identified the chemical, he planned to release the remaining contents of the chamber at a controlled rate by means of the valve at the bottom of the chamber connected to a hose, which would be extended some distance away to a 55-gallon drum containing an appropriate neutralizing solution. A pipe was to be attached to the end of the hose and inserted in the 55-gallon drum. The chemicals were to pass from the hose and pipe through holes drilled in the end of the pipe, and "bubbled" or "scrubbed" through the neutralizing solution. Thereafter, the contents of the drum were to be solidified and taken to a secure landfill.

After agreeing upon a price, Saddington hired A-Line to dispose of the cylinders in the manner Kachur had suggested. Saddington made no investigation into A-Line's reputation or experience in the disposal of pressurized gas cylinders, nor did he ascertain whether Kachur had ever successfully used the chamber to sample toxic chemicals.

When Kachur arrived at ELI's facility in Hanover County to do the work, Saddington agreed to a new plan Kachur proposed, which eliminated the sampling process. At trial, every witness familiar with principles of chemistry testified that it is important to identify the chemical in order to know what solution will safely and successfully neutralize it. Kachur gave no reason for the change of plan, and Saddington testified that he did not know why it would not be necessary to sample the contents before attempting to neutralize them.

When Kachur set up his operation in ELI's driveway, he positioned the chamber approximately eight feet from ELI's open garage door. Employees and business invitees of ELI and of Environmental Equipment, Inc. (Environmental Equipment), the two businesses occupying the adjacent building, customarily used the area to enter and leave the building and, therefore, were required to pass by the chamber and the neutralizing drum as Kachur did the work.

Steven Pond, one of the owners of ELI, allowed the operation to be done on ELI's premises because he said Saddington told him that he would be present the whole time to supervise the project. Saddington was present on the first morning, February 23, 1982, when Kachur began working, and Saddington testified he remained during most of the three days Kachur was there to ensure the operation was performed efficiently and safely. Saddington admitted he had authority to stop the work if he felt Kachur was not conducting it in a safe manner.

Saddington observed a number of incidents when he was overseeing Kachur's work which indicated that the operation was not being conducted as planned, but Saddington did not say or do anything. On the third day, Kachur had completed work on all cylinders except cylinder #12 which was the largest one, and which later was found to contain pentaborane. Saddington told Joseph Feyti, Kachur's co-worker, "I don't want to be around when you do that one." When Saddington left the work site for the day,

he told Pond that the work was essentially finished and the men were cleaning up.

About 6:00 p.m. on February 25, 1982, Hubert C. Mentz, the owner of Environmental Equipment, saw Feyti and Kachur around the chamber without masks or gloves, and asked them what material they were working with. Feyti replied, "Damn if we know." When Feyti opened the valve at the top of the chamber, a white mist escaped. Shortly thereafter, Kachur removed the hose from the valve at the bottom of the chamber, and apparently drained a small amount of clear liquid into an open beaker. Kachur added water to the then unknown fluid in the beaker and mixed them together with his hand. Mentz noticed an odor similar to the smell of "burnt beans," and Feyti remarked that the odor smelled like "rotten eggs."

Kachur took the sample into ELI's laboratory, where he was overcome by the fumes and lost consciousness. William Anderson, an ELI employee, called the rescue squad.

When the rescue squad members arrived at the ELI office, they found Kachur lying unconscious on the floor, unresponsive to light and having difficulty breathing. They noted a faint sweet odor in the office and found Anderson seated on a chair nearby, but too confused to give them any information.* Feyti, who was still out in the driveway, was hyperactive and had white powder on his hands and a strong, pungent odor on his clothes. Feyti could tell the rescue squad members that the problem was some kind of chemical but that he did not know what it was. A number of rescue squad members became ill from breathing the pentaborane fumes while administering first aid and rushing the three victims to the hospital. Kachur later died without regaining consciousness.

Using special equipment to protect themselves against the pentaborane, members of another disposal firm unsuccessfully attempted to neutralize the contents of what was later identified as cylinder #12 by passing it through a new caustic solution in the 55-gallon drum. Thereafter, the state hazardous materials emergency response officer arranged for the destruction of the cylinder by explosion at Camp A. P. Hill.

* Anderson's injuries were so severe that he is now described as a "vegetable," living in a nursing home.

## II. *MATERIAL PROCEEDINGS IN THE TRIAL COURT*

Twelve of the plaintiffs who sought damages for personal injuries were rescue squad workers who were injured while responding to the emergency call. Mentz and Ronald H. Flournoy, one of Mentz's business invitees who came upon the scene just after Kachur drew the sample, also sought damages for personal injuries. Environmental Equipment claimed property damage. Edward J. Sawyer, the general partner of a limited partnership known as Americamps Richmond-North (Americamps), the owner of a campground about 400 yards from where Kachur released the chemical, sought damages for the interruption of the partnership's business. The campground had to be closed for a day because of the dangers created by the release of the chemical.

Each of the 16 plaintiffs sued Texaco, Philip Morris, A-Line and ELI for compensatory and punitive damages. ELI settled with the plaintiffs during trial, but remained a party to the litigation because of its potential liability for indemnification to Texaco and Philip Morris.

By agreement of the parties, the trial was bifurcated as to the issues of liability and damages. The trial court held A-Line and Philip Morris liable as a matter of law, and the jury returned a verdict of liability against Texaco. During the damage phase of the trial, the jury returned verdicts for compensatory and punitive damages for all plaintiffs except Flournoy and Environmental Equipment, who recovered verdicts for compensatory damages only. By agreement of all parties, the trial court determined the amount of Sawyer's compensatory and punitive damages.

The jury awarded $1,000,000 in punitive damages to Bonnie Jean Gore, one of the rescue squad members, $200,000 against A-Line and $400,000 apiece against Philip Morris and Texaco. On post-verdict motions by Philip Morris and Texaco, the trial court ordered a remittitur of $200,000 on each of the $400,000 punitive damage awards against Philip Morris and Texaco. The trial court denied claims for indemnity made by three of the defendants against the other defendants, and held that ELI's settlement precluded claims for indemnity against it by the other defendants.

## III. *PROCEEDINGS ON APPEAL*

In these appeals, the primary issue is the liability of the defendants for compensatory and punitive damages for personal injuries

and property damage arising out of the accidental release of pentaborane.

Philip Morris consolidated all of the rescue squad members' claims in one appeal and Mentz's and Flournoy's claims in a second appeal. In its third appeal, Philip Morris challenges the trial court's ruling in the Sawyer case. Texaco and A-Line have joined all three groups of claimants in their separate appeals. Bonnie Jean Gore filed a separate appeal contesting the remittitur of a portion of the amount fixed for her punitive damages.

In their various appeals, Philip Morris and Texaco also appealed the denial of indemnification or contribution against A-Line and the denial of indemnification against each other.

We first discuss and adjudicate issues common to the various claims, and then turn to issues peculiar to individual cases. Additionally, we will dispose of a number of assignments of cross-error.

## IV. *COMMON ISSUES*

### (A) *Claims of the Plaintiffs*

#### (1) *Liability of Texaco*

Texaco bases its argument of non-liability as a matter of law upon two contentions. We find no merit in either contention for the reasons which follow.

Underlying the first contention, Instruction 11 told the jury, in pertinent part, that if the buried cylinders involved an unreasonable risk of harm to others, and Philip Morris had "reasonable opportunity to take effective precautions against it," Texaco would not be liable to the plaintiffs. The jury found against Texaco, but Texaco maintains that the undisputed evidence shows, as a matter of law, that Philip Morris did have a reasonable opportunity to take the necessary precautions.

Texaco maintains that the instruction and Restatement (Second) of Torts §§ 366 and 373 (1965), upon which the instruction was based, require only that Philip Morris had had an opportunity to take effective precautions to prevent injury to others and *not* that it had had the additional opportunity to neutralize and dispose of the cylinders. Texaco argues that Philip Morris could have left the cylinders in the ground and thereby prevented injury to others.

■ The difficulty with Texaco's position is that all the experts on chemicals testified at trial that the neutralization and disposition of the dangerous contents of the cylinders was required to "prevent injury to others"; the cylinders simply could not be left buried on the Philip Morris property without eventual danger to others. The jury, on disputed facts, found against Texaco on that issue, *i.e.*, that Philip Morris did not have the required reasonable opportunity to take effective precautions. The evidence is sufficient to support that finding.

Texaco next argues it is not liable as a matter of law because its negligence, if any, became a remote cause of the release of the pentaborane by reason of the superseding negligence of A-Line and Philip Morris. The issue of proximate cause was submitted to the jury and decided adversely to Texaco. The resolution of this question turns upon the foreseeability of the subsequent negligence of A-Line and Philip Morris.

Relying upon a line of cases ending with *Banks* v. *City of Richmond*, 232 Va. 130, 348 S.E.2d 280 (1986), Texaco argues that its negligence could not be a proximate cause because "Texaco could not reasonably have foreseen that a sophisticated company like Philip Morris would act so negligently . . . The dominion and control that Philip Morris . . . and A-Line exerted over the cylinders constituted a new, unexpected factor that was the real cause of the plaintiffs' injuries."

■ In *Banks*, the extraordinary and unforeseeable manner by which the negligent actor later brought about the harm insulated the first negligent actor from liability. An apartment building maintenance man, responding to a tenant's complaint that her oven was not working, *turned on* the gas supply to the oven which the city had shut off months before. When the maintenance man smelled the odor of gas, he shut off the gas to the oven. Later, however, he lit a cigarette lighter to look inside the oven, causing an explosion. The city was charged with negligence in failing to disconnect the gas line to the entire unit months before, until the gas leak to the oven could be repaired. We held that it was extraordinary and unforeseeable that a person would reconnect the gas to the oven without investigating the reason why it had been disconnected and, more particularly, that a person, after having connected the gas and having smelled it, would later insert a lighted flame inside the oven. 232 Va. at 136, 348 S.E.2d at 283.

█ Texaco knew it was dangerous to bury pentaborane in pressurized cylinders. Indeed, one of the dangers discussed by the witnesses, some of whom were Texaco employees, was the risk of injury when the cylinders were ultimately excavated. Texaco knew, or should have known, that the cylinders might be in a deteriorated condition when excavated and dangerous to neutralize. We believe that, unlike the situation in *Banks*, it was foreseeable that a person might be injured in a negligent attempt to dispose of the cylinders. Therefore, we find no merit in the argument of extraordinary intervening negligence.

█ Moreover, we said in *Coleman* v. *Blankenship Oil Co.*, 221 Va. 124, 131, 267 S.E.2d 143, 147 (1980), that:

> In order to relieve a defendant of liability for his negligence, negligence intervening between the defendant's negligence and the injury 'must so entirely supersede the operation of the defendant's negligence that it alone, without the defendant's [negligence contributing] thereto in the slightest degree, produces the injury.' Furthermore, an intervening cause is not a superseding cause if it was 'put into operation by the defendant's wrongful act or omission.'

(Citations omitted.) The evidence is compelling that Texaco's negligent act "put into operation" Philip Morris' efforts to neutralize and dispose of the cylinders.

The trial court was correct in its refusal to set aside the verdict on these grounds.

### (2) *Liability of A-Line*

█ A-Line argues that the jury should have decided the issue of its liability and that the trial court erred in holding it liable, as a matter of law. Ordinarily, issues of negligence and proximate cause are for the jury. *Brown* v. *Koulizakis*, 229 Va. 524, 531, 331 S.E.2d 440, 445 (1985). But where reasonable men may not disagree on the facts and the inferences to be drawn from the facts, those issues become questions of law for the court to decide. *Jordan* v. *Jordan*, 220 Va. 160, 162, 257 S.E.2d 761, 762 (1979); *Mitchell* v. *Lee and Jones*, 213 Va. 629, 631, 194 S.E.2d 737, 739 (1973).

█ In our opinion, the evidence established, as a matter of law, that A-Line was negligent and its negligence was a proximate

cause of the injuries and damages alleged. Weiss told Kachur the chamber was not ready for use with toxic chemicals. Moreover, Weiss stated that the chamber needed a self-contained manifold system to test the samples drained from it. Kachur not only failed to develop any such system, he elected to "test run" his unproven chamber on two cylinders containing a supertoxic chemical and 13 other cylinders containing unknown chemicals.

All witnesses familiar with the disposal of chemicals testified that the unknown contents of the cylinders should have been handled as if they were the most dangerous chemicals imaginable. Kachur drained some of the unknown contents of pressurized cylinder #12 into an open beaker without wearing a self-contained breathing device. Although the two survivors at the scene smelled a distinctive odor after Kachur partially filled the beaker, he carried the open beaker into ELI's laboratory for testing, where the continued evaporation of the chemical eventually killed him and seriously injured ELI's laboratory technician. Kachur had no safety plan to protect other persons from the release of deadly gases during his work, nor did he post any warning signs. Consequently, innocent bystanders suffered injury, and rescue squad members were injured while responding to Anderson's calls for help.

█ Certainly Kachur never intended to injure himself or others, but his gross ignorance or carelessness in releasing a deadly chemical compound into the atmosphere establishes liability upon his employer, A-Line, as a matter of law. The trial court correctly struck A-Line's evidence and instructed the jury to return a verdict against A-Line.

### (3) Liability of Philip Morris

Philip Morris contends that the judgment against it should be reversed for a number of reasons. First, it says that "the issue of Philip Morris' and Texaco's negligence was put to the jury in an 'either/or' manner" and the jury's verdict against Texaco "exonerated Philip Morris from any active negligence," because the jury found Philip Morris did not have reasonable opportunity to take effective precautions to protect against the harm.

Philip Morris overlooks the fact that the thrust of Instruction 11, the pertinent part of which we quoted earlier, was to discharge Texaco from liability if Philip Morris had had a sufficient oppor-

tunity to discover the danger of the buried cylinders and had taken effective precautions against the danger. The instruction did not contain an enumeration of all of Philip Morris' duties. Philip Morris' liability did not turn on its failure to discover the danger or its failure to take effective precautions against the chemicals. As detailed below, its liability turned on its negligent conduct in attempting to dispose of the chemicals.

■ Second, Philip Morris argues that it cannot be held vicariously liable for the negligence of A-Line because A-Line was an independent contractor. We hold Philip Morris is liable as a matter of law because of its own negligence in selecting and retaining A-Line as an independent contractor under the facts and circumstances of this case.

■ In our prior decisions, we have alluded to the rule of liability for negligent hiring of an incompetent independent contractor. *Kesler* v. *Allen*, 233 Va. 130, 133, 353 S.E.2d 777, 780 (1987); *Wells* v. *Whitaker*, 207 Va. 616, 627, 151 S.E.2d 422, 431 (1966); *Epperson* v. *DeJarnette*, 164 Va. 482, 486, 180 S.E. 412, 414 (1935); *Davis Bakery* v. *Dozier*, 139 Va. 628, 634, 124 S.E. 411, 413 (1924); *Talley* v. *Drumheller*, 135 Va. 186, 191, 115 S.E. 517, 519 (1923). However, we have never expressly imposed such a rule of liability. The principle is described in Restatement (Second) of Torts § 411 (1965) as "liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor . . . to do work which will involve a risk of physical harm unless it is skillfully and carefully done." The trial court properly imposed liability for that negligence upon Philip Morris.

■ Because the trial court found Philip Morris negligent as a matter of law, we state the evidence in the light most favorable to Philip Morris. Philip Morris engaged A-Line without *any* investigation of its competence to perform an admittedly dangerous task. Kachur gave Saddington a self-serving brochure describing A-Line's activities and personnel, which was later shown to be inaccurate in several material respects.

Saddington checked none of the references cited in the brochure and made no independent investigation into A-Line's qualifications or experience in dealing with pressurized cylinders containing toxic chemicals. Had Saddington carefully read the brochure, he would have realized that A-Line had never handled any such cylinders.

The slightest inquiry would have revealed A-Line's inexperience. A perusal of a contractor's self-serving brochure is not sufficient to discharge an employer's duty of reasonable care to employ a contractor who is competent to perform a dangerous task. There can be no doubt that Kachur's incompetence was the ultimate cause of the losses claimed in this case. There is no conflict in the evidence of Saddington's failure to investigate.

Moreover, Saddington negligently failed to discharge A-Line after observing a number of incidents demonstrating A-Line's incompetence and negligence in dealing with the dangerous chemicals. Although Saddington had no right to control the manner in which Kachur did the work, he was present during almost all of the operation to ensure that the work was performed safely. Saddington had the authority to stop the work if, in his opinion, it was being conducted in an unsafe manner.

Saddington described the following significant deviations from Kachur's plan. On the first day, when Kachur released the contents of the first cylinder, Saddington saw a bluish-green flame consistent with a borate, which Saddington recognized as a reaction with a boron compound. Later that day, while Kachur was processing the contents of the second or third cylinder, Saddington noticed that the ram would not retract when the pressure was released because of the apparent effect of acid upon it. Saddington also heard employees of the neighboring businesses complain of the odors from Kachur's activity, which were apparently entering their work areas through the buildings' ventilation systems, but Saddington did nothing about it.

On the second day, one cylinder did not fit into any of several chamber cradles so that the ram would hit the valve of the cylinder when activated. Saddington saw Kachur tie that cylinder to a piece of wood, drop both into the chamber, close the chamber, and attempt to sever the valve from the cylinder. Because the valve was not in a cradle and, therefore, not aligned with the ram, the ram merely punctured the cylinder, and the cylinder would not drain properly. Although he was not wearing any protective breathing device or protective clothing, Kachur opened the chamber, extracted the cylinder and poured its contents into the 55-gallon drum, where it produced a chemical reaction and a visible vapor. Saddington conceded this vapor may have been the chemical escaping from the caustic solution without having been neu-

tralized. Moreover, Saddington told one person about one occasion when combustion occurred within the chamber.

Saddington knew there were no barriers to keep employees and customers of ELI and Mentz away from the chamber or the drum and no signs warning them of the danger. Saddington also knew Kachur had no air monitoring device, which one expert said was a safety device to detect the presence of gas which was not of sufficient concentration to emit an odor.

We have not previously had occasion to rule directly on the liability of one who negligently retains an incompetent independent contractor. We have, however, invoked the underlying rationale for the tort of negligent retention in another context. Formerly, a charitable hospital was not held vicariously liable for the negligent acts of its agents, but we have held a charitable hospital liable for the negligent selection or retention of its nurse-employees. *See Norfolk Protestant Hospital* v. *Plunkett*, 162 Va. 151, 155-56, 173 S.E. 363, 365 (1934). In at least one other jurisdiction, liability has been imposed for negligent retention of an incompetent subcontractor. In *Lattea, Adm'r.* v. *City of Akron*, 9 Ohio App. 3d 118, 124, 458 N.E.2d 868, 874-75 (1982), the state was held to have been actively negligent in retaining an independent contractor who was performing work in an obviously unsafe manner, and indemnification against the contractor was denied for that reason.

We apply this duty of care to this case. Given the highly dangerous nature of the activity and the obviously inadequate response to that danger, no reasonable person could believe Saddington was not negligent in failing to terminate A-Line's services, if not after the first day, certainly after the second day of its work.

Finally, Philip Morris knew this work was likely to involve a peculiar, unreasonable risk of physical harm to others unless special precautions were taken. Yet it made *no* provisions for any such precautions. We have imposed liability in such circumstances upon employers of independent contractors in a number of earlier cases. *See, e.g., Ritter Corp.* v. *Rose*, 200 Va. 736, 741-42, 107 S.E.2d 479, 483 (1959). In *N. & W. Railway* v. *Johnson*, 207 Va. 980, 987, 154 S.E.2d 134, 139, *cert. denied*, 389 U.S. 995 (1967), we pointed out that the rule did not apply if the "work . . . is of such character that, if properly done, no injurious consequences can arise [as contrasted with] work which is of such character that injury to others is likely unless precautionary measures are

adopted." Although we recognized in *Johnson* that uncontrolled steam would be dangerous if released, we concluded that its transmission "in its normal and ordinary mode" through properly designed and constructed hoses did not involve a peculiar risk of bodily harm requiring special precautions to be taken. *Id.* at 988, 154 S.E.2d at 139-40. Therefore, we held the employer did not need to take special care to see that the independent contractor used the proper hose.

Philip Morris, citing *Johnson*, claims that the disposal of supertoxic wastes in an unproven chamber by bubbling them through a caustic solution is analogous to transmitting live steam in a heavy duty hose. In contrast to *Johnson*, no evidence in these cases shows that passing toxic chemicals through an untested device such as A-Line's and into drums of caustic solution is a normal method used to neutralize such chemicals. In fact, the record discloses that the only way unidentified chemicals in corroded cylinders have been disposed of safely is by exploding or burning them in remote areas well away from humans, taking a number of special precautions to protect persons from the heightened risk of injury from such an operation. We find no merit in Philip Morris' claim that the rule enunciated in *Rose* should not apply to it.

### (B) *Defendants' Defenses*

#### (1) *Assumption of the Risk and Contributory Negligence*

All defendants claim the trial court erred in failing to submit to the jury the issues of the assumption of the risk and contributory negligence of all personal injury plaintiffs. We said in *Amusement Slides Corp.* v. *Lehmann*, 217 Va. 815, 818-19, 232 S.E.2d 803, 805 (1977):

> The associated defenses of contributory negligence and assumption of risk differ in that an objective reasonable man test is brought to bear on the former while the standard primarily to be applied to the latter 'is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates.' *Restatement (Second) of Torts* § 496D, Comment c (1965). Assumption of the risk is venturousness and has two requirements: the nature and extent of the risk must be fully appreciated and the risk must be voluntarily in-

curred. *Buffalo Shook Co.* v. *Barksdale*, 206 Va. 45, 48, 141 S.E.2d 738, 741 (1965). 'Knowledge of the risk involved is essential to its assumption.' *Budzinski* v. *Harris*, 213 Va. 107, 110, 189 S.E.2d 372, 375 (1972).

■ Of course, the burden of proving these affirmative defenses is upon the defendants. *Arndt* v. *Russillo*, 231 Va. 328, 343 S.E.2d 84 (1986). Each defense requires sufficient evidence of knowledge on the part of each plaintiff of the danger to be guarded against before that issue may be submitted to the jury. *Id.* at 334, 343 S.E.2d at 88.

The defendants sought to charge the various rescue squad members with knowledge of the contents of a radio message indicating a "toxic gas leak, chemical is unknown," and with knowledge of other messages sent to the rescue squad vehicles. The four rescue squad members who testified in the liability phase of the trial were not asked whether they had heard those messages.

The following four persons were the only rescue squad members who testified in the liability phase of the trial. David Perry testified that he heard something about the "subject being down, difficulty in breathing," and Carol Leigh Wickham testified that her only information was that a patient's heart had stopped beating. Bonnie Jean Gore said she heard a patient had either stopped breathing or that his heart had stopped, and L. Everette Williamson, the only other rescue squad member who testified in the liability phase, described the call as being for a "man down, difficulty in breathing."

There was no evidence from any other source that these four members of the rescue squad, or any other members, were in a position in which they could, or should, have heard these additional messages. The rescue squad members were riding in speeding vehicles whose sirens were blaring, and there was no evidence concerning the quality of the transmission to the several vehicles. Neither do we know whether the radio messages could have been heard throughout the vehicle or only in its front or rear compartments. In the absence of proof of these matters, a jury could only speculate that the messages could, or should, have been heard.

Perry said Feyti told him there "was a chemical, they did not know where it was, and we should leave." Gore testified that when she arrived at the scene she noticed a strong odor and immediately felt a burning sensation in her throat and that her chest hurt. Wil-

liamson said that when they drove up to the driveway, they were waved in and told that a man needed oxygen. Williamson noticed a faint odor, which he associated with acetylene welding, when they entered ELI's office.

■ We do not believe having the above information was sufficient to create a factual issue on the question of actual or constructive appreciation of the nature and extent of a risk of danger from a poisonous gas on the part of any rescue squad member.

■ Even if they had heard something about a toxic gas leak, these rescue squad members were responding to an emergency created by the negligence of the defendants. Delaying their rescue efforts to obtain oxygen masks, or other equipment to protect themselves against the gas, could have resulted in even more serious injury to the victims. Paraphrasing what we said in another rescue case in upholding the denial of an assumption of risk instruction, the plaintiffs' choices were not voluntary, as a matter of law, because the alternative course of conduct was one which they could not reasonably be required to accept. *VanCollom* v. *Johnson*, 228 Va. 103, 107, 319 S.E.2d 745, 747 (1984).

■ Mentz, the owner of Environmental Equipment, had been in and out of the building during the three days the A-Line men were working. He noticed that Kachur and Feyti did not always wear self-contained breathing masks or protective clothing as they worked. Pond of ELI assured him the operation posed no danger. At the time of the incident, Mentz saw Kachur and Feyti working on the chamber without masks when a white mist escaped from the top of the chamber. When Mentz observed Kachur drain the liquid from the bottom of the chamber and stir it with his hand, Mentz also noticed it had an odor like that of burnt beans. Mentz stayed in the area watching this activity for about nine minutes. We do not believe that a reasonable person could find that Mentz appreciated, or should have appreciated, the nature and extent of a risk of injury from the toxic chemicals which Feyti and Kachur handled so casually.

■ Flournoy, who was a business invitee of Mentz's, came upon the scene after the rescue squad had arrived, smelled nothing, saw no vapors in the air, and came no closer when he was told there had been a spill. While he did not leave the area immediately, the evidence is insufficient, as a matter of law, to show that Flournoy had, or should have had, any realization that the spill involved a deadly chemical.

In sum, we find the evidence wholly insufficient as to all plaintiffs to submit the issues of contributory negligence or assumption of the risk to the jury.

## (2) *Fireman's Rule*

In *Chesapeake & Ohio Railway* v. *Crouch*, 208 Va. 602, 608, 159 S.E.2d 650, 654, *cert. denied*, 393 U.S. 845 (1968), we said that paid firemen assume the usual risks inherently involved in fire fighting. We based our holdings, not upon venturousness in the face of known danger, but upon the relationship between firemen and the public, from which arises firemen's obligation to accept the *usual risks* of injury from fire fighting. *Cf. Pearson* v. *Canada Contracting Co.*, 232 Va. 177, 182, 349 S.E.2d 106, 109-10 (1986) (fireman's rule considered in context of duty landowner owes to policemen and firemen). All defendants urge that we apply the fireman's rule to rescue squad personnel.

Unlike the perils *usually* faced by firemen, the peril to which the rescue squad workers in this case were exposed was not a risk commonly encountered in the performance of their duties. It is highly *unusual* that an extremely hazardous chemical such as pentaborane would be released into the environment by accident and that experienced rescue squad members would be aware of the likelihood of such happening. Indeed, these rescue squad personnel had no way of knowing the identity of the released chemical, and like the firms Philip Morris contacted to dispose of the cylinders, they were not experienced in or equipped to handle such a danger. Hence, the peril the rescue squad members faced was not foreseeable, and the fireman's rule is inapplicable under the facts in this case.

## (3) *Damages*

### (a) *Americamps' Claim for Negligent Interference with Contractual Relations*

Americamps operated a campground within 400 feet of ELI, and the partnership claims damages against all defendants for interference with the operation of the facility. This damage claim arose because Americamps was ordered to evacuate the campers because of the potential danger of the pentaborane gas Kachur

negligently released. There was no evidence that any of the pentaborane gas actually invaded the campground.

Americamps concedes that there was no physical entry or damage to the campground and that, under ordinary circumstances, such losses are not recoverable. Describing the negligent release of pentaborane as creating "problems of uniqueness and magnitude" and an "unnecessary, extraordinary and inherently dangerous" hazard, Americamps urges us to create an exception to the rule expressed in Restatement (Second) of Torts § 766 (1977) that "[o]ne is not liable to another for pecuniary harm not derived from physical harm to the other, if that harm results from the actor's negligently . . . interfering with the other's performance of his contract . . ."

Although a number of persons were substantially affected by the negligent handling of a "supertoxic" chemical, the "uniqueness" of the incident provides no justification for abandoning the requirement of physical harm from negligent interference with contract. We refuse to create any such exception.

Americamps also asserts two alternate theories of liability, strict liability in tort and nuisance. Neither has merit.

We have applied strict liability in a blasting case where property was damaged by dirt and debris from the blast. *M. W. Worley Construction Co. v. Hungerford, Inc.*, 215 Va. 377, 210 S.E.2d 161 (1974). In *Laughon & Johnson, Inc. v. Burch*, 222 Va. 200, 278 S.E.2d 856 (1981), we extended the rule to allow recovery for property damage caused by concussion and vibration from blasting. Both cases, however, were based upon the "intrinsically dangerous and ultrahazardous activity [of blasting] since it is impossible to predict, with certainty, the extent of severity of a blast." *Worley*, 215 Va. at 379, 210 S.E.2d at 163. Implicit in these holdings is the fact that injuries may result from blasting, despite every reasonable precaution.

Americamps relies on the criteria stated in Restatement (Second) of Torts § 520(c) (1965) for determining whether an activity is ultra-hazardous. One criterion is an "inability to eliminate the risk by exercise of reasonable care." *Id.* That criterion is not met here because Texaco, Philip Morris and A-Line all had the ability to eliminate the risk of injury by exercising reasonable care.

Americamps also urges the doctrine of liability for maintenance of a nuisance as a means of recovery for damages. In all the cases

Americamps cites, the smoke, odors, and water entered the premises of the plaintiff; no such thing happened in this case.

The object of Americamps' action is to recover damages for negligent conduct. Americamps pled both negligence and nuisance as a basis for liability, but the nuisance allegedly was the result of negligent conduct. We will look to the object of the action, rather than its form, to determine the extent of liability of the defendants.

In *Randall* v. *Village of Excelsior*, 258 Minn. 81, 103 N.W.2d 131 (1960), the plaintiff, a minor alleged to have been intoxicated, sought to avoid the defense of contributory negligence by invoking the doctrine of nuisance in his action for personal injuries arising out of the sale of intoxicating liquor to him. Even though the prior indiscriminate sale of liquor to minors was said to be a nuisance, the court applied the defense of contributory negligence to the plaintiff, saying:

> Merely attaching the label 'nuisance' to an action for personal injuries does not alter the nature of the action. Where the acts or omissions constituting negligence are the identical acts which it is asserted give rise to a cause of action for nuisance, the rules applicable to negligence will be applied.

258 Minn. at 86, 103 N.W.2d at 135. Similarly, Americamps may not recover damages for the negligent conduct alleged merely by characterizing the results of the conduct as a nuisance.

We conclude that Americamps has no basis for a claim for damages. Accordingly, we will reverse the judgments entered in its favor against all three defendants.

### (b) *Punitive Damages*

Texaco, Philip Morris, and A-Line each contends that the evidence was insufficient to submit to the jury the issue of punitive damages. Because punitive damages are in the nature of a penalty, they should be awarded only in cases of the most egregious conduct.

Willful and wanton negligence is the basis for the plaintiffs' claim for punitive damages against all three defendants. We recently defined willful and wanton negligence as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant

aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Griffin* v. *Shively*, 227 Va. 317, 321-22, 315 S.E.2d 210, 213 (1984).

We have decided a limited number of cases involving "willful and wanton" negligence. In *Griffin*, we found the evidence sufficient to create a jury issue of willful and wanton negligence where the defendant fired a gun in close proximity to a number of people in a relatively small room. 227 Va. at 322, 315 S.E.2d at 213. In *Friedman* v. *Jordan*, 166 Va. 65, 68, 184 S.E. 186, 187 (1936), we said chasing a bicyclist with a car and running over him involved "willful or wanton" negligence. We indicated that driving a vehicle on the wrong side of a street in the face of approaching traffic might constitute wanton negligence in *Thomas* v. *Snow*, 162 Va. 654, 664, 174 S.E. 837, 839 (1934).

On the other hand, we have held no jury issue of willful or wanton negligence was created merely because an employer failed to ascertain that a prospective employee lacked the proper chauffeur's license to operate a non-owned truck. *Wallen* v. *Allen*, 231 Va. 289, 297, 343 S.E.2d 73, 78 (1986). No such issue was raised because of a rear-end collision caused by a defendant's failure to keep a proper lookout, even though that failure may have been caused in part by her consumption of alcohol. *Baker* v. *Marcus*, 201 Va. 905, 910, 114 S.E.2d 617, 621 (1960). Looking away from the road and down at the gearshift while driving a heavy truck at a speed of 35 to 40 miles an hour while approaching a curve did not present a jury question of willful or wanton negligence in *Boward* v. *Leftwich*, 197 Va. 227, 231, 89 S.E.2d 32, 35 (1955). We pointed out in *Morris* v. *Dame*, 161 Va. 545, 569-70, 171 S.E. 662, 670-71 (1933), that a violation of the reckless driving statute did not, of itself, establish willful or wanton negligence. We sustained a trial court in striking a claim of punitive damages arising out of an automobile manufacturer's negligent design of a parking gear and negligent failure to correct the defect or warn others of it in *Ford Motor Co.* v. *Bartholomew*, 224 Va. 421, 436-37, 297 S.E.2d 675, 683-84 (1982).

There is no factual dispute concerning what measures Texaco and Philip Morris took. The question is whether those precautions showed that some care was taken, even though insufficient, for the safety of others.

Texaco's burial of the cylinders in pits, marking the pits with pipes and noting their location on a map indicated that some attention, even though insufficient to constitute reasonable care, was being given to the danger. The fact that it later supplied additional information concerning the chemicals is evidence of Texaco's concern for the safety of others.

██ Philip Morris' efforts to neutralize the contents of the cylinders, although negligent as a matter of law, showed some concern for the safety of others. It did attempt to provide some supervision. Saddington's presence during most of the work gave evidence of a degree of care taken by Philip Morris.

The evidence is sufficient to prove something more than ordinary negligence and, perhaps, gross negligence, on the part of Texaco and Philip Morris. Yet, we hold, as a matter of law, that the evidence fails to prove that their acts and omissions constitute willful and wanton negligence as we have defined and applied that term.

We need not decide whether the trial court erred in requiring a remittitur of the Gore award of punitive damages against Texaco and Philip Morris because of the foregoing rulings.

██ On the other hand, a jury could find that when Kachur drained an unknown chemical from a pressurized chamber into an open beaker and carried the beaker into ELI's office, he took no precautions at all and acted with a reckless indifference to the consequences. He knew he was hired to dispose of dangerous chemicals. In fact, he knew that at least two of the cylinders contained pentaborane, and he should have treated all the remaining unmarked cylinders as though they contained equally dangerous chemicals. Kachur knew that oxygen masks were essential for protection, yet he exposed himself, Feyti, and Anderson to a chemical which was emitting an odor and obviously reacting in some fashion with the outside air.

We find there was sufficient evidence of Kachur's wanton negligence to support the jury's award of punitive damages of $200,000 to Gore and $50,000 to Mentz against A-Line.

(4) *Exclusion of Evidence*

 (a) *Tapes of Communications Center and Refreshing Dispatcher's Recollection*

■ The jury listened to the emergency communications center's tape recordings of radio messages which were dispatched to the rescue squad vehicles. This was an attempt by the defendants to establish notice to the rescue squad members of the danger of toxic gas. The defendants unsuccessfully sought to introduce into evidence a typed transcript of what was contained in that tape recording for the jurors to read as they listened to the tape. The defendants then attempted to have the persons who had dispatched the messages testify as to what they had said, referring to the tapes, if necessary, to refresh their recollection. In refusing to admit the typed transcript or testimony merely repeating what had been broadcast, the trial court correctly observed that the issue was what the rescue squad workers had *heard* in their vehicles, and not what was on a typed transcript of the broadcast, or what the dispatcher recalled had been transmitted. No evidence was introduced as to what could, or should, have been heard by each of the alleged recipients of the messages.

■ In *Arnold v. Commonwealth*, 4 Va. App. 275, 277-81, 356 S.E.2d 847, 849-50 (1987), the Court of Appeals sustained a trial court in permitting a jury to review a typed transcript of a tape recording of a drug buy as the tape was being played to the jury. Permitting the use of a transcript to help jurors understand what was being said on the tapes was held to be a matter of discretion for the trial court. In that case, however, the issue was *not* what was *heard*, as in this case, but what was *said*. In two earlier cases, we said the refusal to admit repetitious testimony, *Mawyer v. Thomas*, 199 Va. 897, 902, 103 S.E.2d 217, 221 (1958), and corroborative evidence, *Stimeling v. Goodman*, 202 Va. 111, 115-16, 115 S.E.2d 923, 926-27 (1960), was within the discretion of the trial court. We find no abuse of that discretion in the trial court's refusal to admit either the transcripts of the tapes or oral evidence of what was recorded on the tapes.

### (b) *Dr. Mindrum's Testimony*

The defendants sought to qualify Dr. Gordon M. Mindrum, a medical doctor, as an expert "on the effects of pentaborane upon patients who have been exposed to it." Prior to 1965, Dr. Mindrum had participated in a study of industrial exposures of humans to pentaborane. Of the 67 persons who had been exposed to pentaborane, 20 were classified as "severe cases" of exposure,

but all the victims were said to have no symptoms after three weeks.

The defendants proffered this testimony to counter the evidence of anticipated continued psychiatric disturbances the plaintiffs had adduced. Dr. Mindrum, who is not a psychiatrist, had never examined any of the plaintiffs and did not know the extent of their exposure (or the extent of the exposure of the 20 persons in his study for that matter). He admitted that no long-term psychiatric studies had been done on the 20 persons in the study.

 The trial court refused to qualify Dr. Mindrum as an expert, pointing out that he was not a psychiatrist, that he had never examined any of the plaintiffs, that he had not kept up with the changes in psychiatry in the 20 years since his study, and that the evidence was speculative. "Whether a witness should be permitted to express an opinion as an expert is a question within the sound discretion of the trial court, and we will not reverse a decision to exclude a proffered expert opinion unless it appears clearly that the witness was qualified." *Landis* v. *Commonwealth*, 218 Va. 797, 800, 241 S.E.2d 749, 750-51 (1978). It does not appear clearly that Dr. Mindrum was qualified as an expert in the area in which his testimony was proffered, and we find no error in the exclusion of his testimony.

### (C) *Indemnification*

 Texaco and Philip Morris seek indemnification from the other defendants, alleging that their liability was not predicated on active negligence. If a defendant is guilty of active negligence, he may not obtain indemnification from any other defendant. *See Halliburton Co.* v. *Norton Drilling Co.*, 302 F.2d 431, 437 (5th Cir. 1962), *cert. denied*, 374 U.S. 829 (1963); *Guarnieri* v. *Kewanee-Ross Corp.*, 270 F.2d 575, 579-80 (2d Cir. 1959); *Lattea, Adm'r.*, 9 Ohio App. 3d at 122, 458 N.E.2d at 873.

 The jury found that Texaco created a dangerous condition which was a proximate cause of the plaintiffs' injuries. Texaco was not held liable on a theory of vicarious liability, such as was applied in the New York case of *Mauro* v. *McCrindle*, 70 A.D.2d 77, 419 N.Y.S.2d 710 (1979), *aff'd.*, 52 N.Y.2d 719, 417 N.E.2d 567, 436 N.Y.S.2d 273 (1980), which Texaco cites, but rather because of its own active negligence. Therefore, Texaco is not entitled to indemnification.

We have already held, as a matter of law, that Philip Morris was negligent and that the negligence was a proximate cause of the various injuries. This was active negligence and precludes any claim by Philip Morris for indemnification.

Because of the foregoing rulings, we need not decide whether the trial court erred in its ruling regarding ELI's release from liability for indemnity to the other defendants.

■ We take no notice of the trial court's ruling against Philip Morris' claim for *contractual* indemnity against A-Line and ELI because Philip Morris failed to assign error to those rulings. Rule 5:17(c). The assignment of error was that "the court erred in ruling as a matter of law that Philip Morris was actively negligent and was therefore not permitted to recover indemnification from Texaco, A-Line and Environmental."

The trial court's ruling in regard to the *contractual* agreement for indemnity was:

> The contractual indemnity claim of Philip Morris against A-Line and Environmental fail for lack of specificity in their written agreements . . . . The language in the contracts between Philip Morris and A-Line and Environmental lack such specific language and accordingly cannot properly be construed to impose a requirement of indemnification upon A-Line and Environmental for the negligence of Philip Morris.

Philip Morris did not refer to any allegedly erroneous ruling of the trial court in construing the contract; its complaint was of an erroneous ruling holding it could not recover indemnification because it was actively negligent, as a matter of law. We hold that the assignment of error did not point out this alleged error with the required reasonable certainty. *Harlow* v. *Commonwealth*, 195 Va. 269, 271, 77 S.E.2d 851, 853 (1953).

## V. ISSUES UNIQUE TO ONE APPEAL

### (A) *Philip Morris v. Mentz*

Mentz assigns cross-error to the trial court's refusal to set aside the verdict for compensatory damages as inadequate. The jury fixed Mentz's compensatory damages at $7,620. The parties stipulated his business losses as $1,820, which means the jury fixed his compensatory damages at $5,800 for the personal injury claim.

Mentz claims that he spent $4,247 for medical treatment and, therefore, that the jury awarded slightly less than $1,600 for his mental anguish, pain and suffering and other non-monetary damages. Although there was no substantial dispute concerning the amount Mentz expended for medical treatment, there was a dispute as to the extent of his mental disability.

We said in *Modaber* v. *Kelley*, 232 Va. 60, 69, 348 S.E.2d 233, 238 (1986), "[t]he question whether a verdict is excessive is initially addressed to the sound discretion of the trial judge who has observed the incidents of trial, which cannot be reproduced in the cold, printed pages of the appellate record." The same principle applies when addressing appellate complaints of an inadequate verdict. *See Dinwiddie* v. *Hamilton*, 201 Va. 348, 352, 111 S.E.2d 275, 279 (1959). An abuse of that discretion is manifested when the size of the award, whether excessive or inadequate,

> shocks the conscience of the Court and creates the impression that the jury was biased in favor of the plaintiff or prejudiced against the defendant or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the plaintiff's injuries as to suggest that it is not the product of a fair and impartial decision.

*Modaber*, 232 Va. at 69, 348 S.E.2d at 238.

Because the jury has fixed the amount of the recovery, we review the evidence in the light most favorable to the prevailing party. Mentz was examined at the hospital on the evening of this incident, released, and sent home. The next day he saw his family doctor, who examined him, took blood samples, and released him. A few days later, the family doctor told Mentz "everything was okay." Mentz lost no significant time or income from his work.

A psychiatrist evaluated Mentz in May of 1982, three months after the incident, and diagnosed him as having a "Post-Traumatic Stress Disorder . . . mild to moderate depression and . . . marital maladjustment." The psychiatrist did not see Mentz again for seven months. At that time, he was diagnosed as continuing to suffer from a post-traumatic stress disorder and his depression was rated as "very severe" and a "Major Affective Disorder." He improved with medication and psychotherapy, but developed alcoholism in July of 1983.

Another psychiatrist saw Mentz in March of 1984 and indicated that Mentz's prognosis was good. Although that psychiatrist testified that Mentz's drinking was symptomatic, he indicated Mentz may have had some degree of control over his drinking had he chosen to exercise it.

Given the delay in seeking treatment, the subjective nature of the extent of a post-traumatic stress disorder, the evidence of excessive drinking, which Mentz might have controlled, and the good prognosis one psychiatrist gave Mentz, we cannot say that the award "bears no reasonable relation to the damages suggested by the facts in the case, and is manifestly out of line and at variance with the facts. . . ." *Bradner* v. *Mitchell*, 234 Va. 483, 486, 362 S.E.2d 718, 720 (1987). We find no abuse of discretion in the trial court's refusal to set aside this verdict.

(B) *A-Line's Claim that Gore's and Mentz's Awards of Punitive Damages were Excessive*

A-Line argues that the punitive damages awarded Bonnie Jean Gore and Hubert C. Mentz are excessive and the trial court should have set those awards aside. The jury fixed Gore's compensatory damages at $30,000 and her punitive damages at $200,000, and Mentz's compensatory damages at $7,620 and his punitive damages at $50,000.

A-Line correctly recognizes that no fixed standard exists for the calculation of punitive damages and that it is an issue largely within the discretion of the jury. *See Old Dominion Branch No. 496, Nat'l. Ass'n. of Letter Carriers* v. *Austin*, 213 Va. 377, 386, 192 S.E.2d 737, 743 (1972), *rev'd on other grounds*, 418 U.S. 264 (1974). Nevertheless, the "amount of punitive damages awarded should bear some reasonable relationship to the actual damages sustained and to the measure of punishment required. . . ." *The Gazette* v. *Harris*, 229 Va. 1, 51, 325 S.E.2d 713, 747, *cert. denied sub nom. Fleming* v. *Moore*, 472 U.S. 1032 (1985).

In deciding whether a reasonable ratio exists between the compensatory damages and the punitive damages awarded to Mentz and Gore, we apply the standard for granting a new trial based on an excessive award of damages we set forth in *Modaber*, 232 Va. at 69, 348 S.E.2d at 238. We have reviewed the record on this issue in both cases, and we cannot say on the evidence before

it that the jury abused its discretion in these awards. Therefore, we will deny A-Line's motion for a new trial on this ground.

## VI. *CONCLUSION*

*Philip Morris* v. *Emerson, et al* — Record No. 841374.

Because of the foregoing, we will: (1) affirm the action of the trial court in its findings that Philip Morris is liable to all plaintiffs as a matter of law, and that Philip Morris is not entitled to indemnification from any other defendant, and (2) reverse the judgments for punitive damages against Philip Morris.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*

*Philip Morris* v. *Mentz, et al* — Record No. 841385.

For the reasons already given, we will: (1) affirm the action of the trial court in its holding that Philip Morris is liable to all plaintiffs as a matter of law and that Philip Morris is not entitled to indemnification from any other defendant, and (2) reverse the judgments for punitive damages against it.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*

*Philip Morris* v. *Edward J. Sawyer, etc., et al.* — Record No. 841405.

In conformity with our previous finding, we will reverse the judgment for Sawyer against Philip Morris.

*Reversed and final judgment.*

*Gore* v. *Philip Morris, et al.* — Record No. 841549

Because we have held that Texaco and Philip Morris are not liable to Gore for punitive damages, we need not decide whether the trial court erred in requiring a remittitur of a part of the punitive damage award.

*Affirmed.*

*Texaco, Inc.* v. *Mentz, et al.* — Record No. 841560

Consistent with the reasons advanced, we will: (1) affirm the action of the trial court in entering judgment against Texaco for compensatory damages to all plaintiffs except Americamps, and in denying indemnification to Texaco from any other defendant, and (2) reverse the judgment of the trial court in awarding punitive damages in favor of all plaintiffs except Americamps and Flournoy and in awarding compensatory and punitive damages to Americamps.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*

*A-Line Industries, Inc.* v. *Emerson, et al.* — Record No. 841564

In conformity with our previous findings, we will: (1) affirm the action of the trial court in finding A-Line liable to all plaintiffs except Americamps and in awarding punitive damages to Mentz and Gore, and (2) reverse the judgment of the court in awarding compensatory and punitive damages to Americamps.

*Affirmed in part,*
*reversed in part,*
*and final judgment.*

RUSSELL, J., dissenting in part.

I agree with the dissenters that the trial court erred in taking from the jury the issue of Philip Morris' negligence and in further ruling, as a matter of law, that Philip Morris' negligence was a proximate cause of the plaintiff's injuries. The fact that reasonable jurors might differ upon those issues was plainly demonstrated by subsequent events.

After taking those issues from the jury, the trial court found itself in the odd position of resubmitting them to the jury as a part of instruction 11, which is quoted in the dissent. That instruction required that the jury, in order to find against Texaco, must first

find that Texaco had *created or actively concealed from Philip Morris* a dangerous condition and that, at the time of the accident, *Philip Morris had not had a reasonable opportunity to take effective precautions against the danger.* The jury, thus given its only opportunity to pass upon the issues of Philip Morris' negligence and proximate cause, exonerated Philip Morris in order to find against Texaco.**

The trial court nevertheless entered judgment against both Philip Morris and Texaco. Seldom has a jury's verdict been treated as such a superfluous appendage. The majority opinion dismisses this invasion of the jury's province on the ground that the "thrust" of instruction 11 was against Texaco. Unfortunately, a jury has no way of knowing the "thrust" or purpose of any instruction. Juries simply receive instructions as judicial pronouncements of the applicable law. The jury took the instruction as the law of the case and applied it to the facts as it found them.

The majority opinion further undertakes to justify the trial court's disregard of the verdict by a lengthy recital of the acts and omissions of Saddington, Philip Morris' employee, which the majority characterizes as negligent. That recital would be most cogent if we occupied the jury box, but none of us did. Those who were in that position took a different view.

Accordingly, I depart from my fellow dissenters' conclusion that the case against Philip Morris should be remanded for new trial. I would enter final judgment here in Philip Morris' favor. In all respects other than the judgments against Philip Morris, I join in the majority opinion.

GORDON, Retired Justice, dissenting in part.

Something is amiss.

In view of Instruction 11,[1] the jury necessarily found by its verdict that:

---

** Ironically, instruction 11 was given at Texaco's request, over Philip Morris' objection.

[1] A seller of land who has created an artificial condition, or has actively concealed it from the purchaser, which involves an unreasonable risk of harm to others outside of the land because of its plan, construction, location, or otherwise, is subject to liability to such persons for physical harm caused by the condition after the purchaser has taken possession of the land.

Such liability continues until the purchaser discovers the condition and has reasonable opportunity to take effective precautions against it. Otherwise, the liability continues only

(1) Texaco created an artificial condition, or actively concealed the condition from Philip Morris.

(2) The artificial condition involved an unreasonable risk of harm to others outside the land (where Texaco buried the cylinders) because of plan, construction, location, or other reason.

(3) At the time of the accident in Hanover County, Philip Morris had not had a reasonable opportunity to take effective precautions against the happening of the accident.

(4) The artificial condition was a proximate cause of the accident.

Yet, the judge found as a matter of law that Philip Morris's negligence was a proximate cause of the accident.

Reason cannot support both findings.

One might doubt that Philip Morris lacked reasonable opportunity to take effective precautions against the happening of the accident. On the other hand, the evidence makes a jury issue whether Philip Morris took reasonable precautions.

Texaco refused to assist Philip Morris in identifying and disposing of the cylinders without a hold-harmless agreement. Reasonable men could conclude Philip Morris had justification for refusing to make that agreement.

Over a period of fifteen months, two companies hired by Philip Morris attempted unsuccessfully to find a contractor that would dispose of the cylinders. No disposal firm would accept the job because government regulations required knowledge of the cylin-

---

until the purchaser has had reasonable opportunity to discover the condition and to take such precautions.

In either case, however, once the purchaser has in fact discovered the danger, and has had reasonable opportunity to take precautions against it, his liability supercedes that of the seller, and the liability of the seller is terminated.

If you believe from the greater weight of the evidence that the defendant, Texaco, Incorporated, created an artificial condition, or has actively concealed such condition from the defendant Philip Morris, Inc., which artificial condition involves an unreasonable risk of harm to others outside of the land because of its plan, construction, location, or otherwise; and if you further believe from the greater weight of the evidence that at the time of the accident involved herein in Hanover County that Philip Morris, Inc., had not had a reasonable opportunity to take effective precautions against it, considering all of the facts and circumstances of this case; and if you further believe from the greater weight of the evidence that this artificial condition was a proximate cause of the accident which occurred in Hanover County, you shall find your verdict in favor of the plaintiffs and against the defendant Texaco, Inc.

ders' contents. To acquire knowledge of contents required taking a sample. Corrosion on the cylinder valves raised fear the valves would not close after opening.

Ultimately, a large waste disposal firm gave Philip Morris the names of two companies who might perform the job. One firm, A-Line, inspected the cylinders and gave Philip Morris a brochure describing its previous disposal activities and experience.

Reasonable men could conclude Philip Morris exercised ordinary care in entrusting the disposal to A-Line.

Having entrusted the disposal to A-Line, Philip Morris could not control this independent contractor's disposal operations. Philip Morris's chemical engineer, Saddington, observed the operations for two days and during part of the third and final day. When Saddington left the site on the third day, he thought the work was essentially finished and the men were cleaning up.

Saddington may have had authority to stop the operations if, in his opinion, they were being performed in an unsafe manner. The jury should have been permitted to decide whether Saddington acted reasonably in failing to exercise his discretion to stop the operations.

These problems in my opinion require a new trial. When the evidence is viewed in the light most favorable to Philip Morris, reasonable men could differ whether it was guilty of negligence. A jury should therefore determine the issue of Philip Morris's liability.[2]

STEPHENSON, J., joins in dissent.

---

[2] Counsel for Philip Morris makes the logical argument that the jury verdict against Texaco acquitted Philip Morris of negligence. I cannot subscribe, however, to the conclusion that an instruction and verdict directed only to Texaco can acquit another party.